Docket No. 105092.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JERMAINE DAVIS, Appellant.

*Opinion filed November 20, 2008.*

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Defendant, Jermaine Davis, was charged with aggravated battery, armed robbery and first degree murder. The first degree murder charge was brought under three different theories–intentional murder, knowing murder (also called strong probability murder), and felony murder. See 720 ILCS 5/9–1(a)(1), (a)(3) (West 2004). A jury in the circuit court of Cook County returned a general verdict of guilty against defendant on the first degree murder charge, as well as a guilty verdict on the offense of aggravated battery. Defendant was sentenced to serve 25 years in prison. Defendant appealed, arguing, *inter alia*, that (1) the cause must be remanded for a hearing under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), because the trial court improperly collapsed the three-step

*Batson* process and allowed the State's peremptory challenge of an African-American juror without engaging in the third stage of the analysis, and (2) because the conduct forming the basis of his aggravated battery was inherent in the murder, the trial court erred in instructing the jury it could convict him of felony murder predicated on aggravated battery. The appellate court rejected those claims and affirmed defendant's convictions and sentence. No. 1–05–1251 (unpublished order under Supreme Court Rule 23). We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315.

## BACKGROUND

Defendant's trial began on February 20, 2004, with *voir dire.* Defense counsel questioned venire member Robert Hicks in the course of selecting the jury. That questioning revealed that Hicks was a retired janitor, who had lived in Chicago since 1970. His hobby was fishing and he kept himself abreast of current events by watching channel 9 news. When asked if he could be a fair juror if selected, Hicks said, "I think so." Defense counsel followed this up by asking if Hicks was "comfortable [that he could] be fair." Hicks responded, "I am comfortable." The prosecutor did not ask any questions of Hicks.

*Voir dire* proceeded, and after one additional prospective juror was questioned, the prosecutor announced that he would exercise a peremptory challenge to Hicks. At that point, defense counsel requested a discussion with the court off the record. Upon returning to the record, the trial court decided to conduct its own inquiry into whether the State had committed a *Batson* violation in its challenge to Hicks. The following proceedings were then had on the record:

> "THE COURT: All right. There has just been–I don't really feel that it has been raised to a Batson type position but, State, why don't you articulate why–and in fairness, being overly fair to the Defense and to the court system, could you articulate why you don't want Mr. Hicks on the jury?
>
> MR. KEATING [Prosecutor]: Judge, yes.
>
> Judge when asked if he could be fair–and I wrote this down, Judge–his response was I think so. In my opinion, Judge, he equivocated when the question was asked. Based on

that Judge, I am uncomfortable. And for that reason, we are exercising a peremptory. *** Thank you.

MR. MAX [Defense counsel]: Judge, for the record, we are making an objection based on the fact that Mr. Hicks–just so the record is clear–is African American. The defendant is African-American. We raised the Batson issue while we were off record, and we believe there is no valid reason for him to be struck. Other people had said I think so. There has been no follow up by the State.

THE COURT: Mr. Jones, did you raise the Batson issue as an issue formally off record or is Mr. Max assuming things that you didn't say?

MR. JONES [Another defense attorney]: Judge, I don't –

THE COURT: That's easy.

MR. JONES: I don't believe I officially–

THE COURT: What you have to do is have integrity here rather than bias.

MR. JONES: I don't believe I officially raised it off the record, Judge.

THE COURT: All right. Don't misquote what happens off the record otherwise there is no purpose in being off the record, Mr. Max. And it wasn't raised off the record as a formal type of objection.

Who is the other African American male that was excused?

MR. JONES: That was Mr.–

THE COURT: These things are easily made accusations by the Defense. I don't take anything lightly when someone is called either prejudiced or racist or anything like that.

Go ahead.

MR. MAX: For the record, to make a Batson objection, I am not calling anyone prejudiced or racist. What I am doing is protecting an issue for the record where if we don't object, that is not a record on appeal, that is waived. I am mandated to make that record to object.

THE COURT: You are not mandated to make allegations.

All right. Go ahead. Who is the other person that you said was excused?

MR. JONES: Andre Honorable, Judge.

MR. KEATING: That's correct, Judge. I made my motion for cause at that time. I think I made my record at that time.

THE COURT: It is in there. And if Mr. Max doesn't want to pay attention to it, that's fine.

I find that your–first of all, your reasons for excusing Mr. Hicks was [*sic*] race neutral. He said he thinks he could be fair. That's enough for you know, a race neutral reason to use a peremptory challenge.

All right.

MR. KEATING: Thank you, Judge.

THE COURT: Go ahead.

MR. KEATING: Judge, we accept this panel.

THE COURT: Okay."

The trial eventually proceeded to the evidentiary portion where it was established that a group of men beat Demetrius Thomas unconscious on October 10, 1999, near a Chicago housing project. A Chicago Housing Authority police officer responded to a call about the incident and found Demetrius Thomas lying in a garbage Dumpster. The victim was taken to a hospital and remained in a coma for two months before he died of an infection that resulted from the brain injuries he suffered in the beating.

Quincy Campbell was a key witness that testified on behalf of the State. He had a criminal record and was a suspect in the case until he gave a statement to police. At trial, he stated that he witnessed a group of men beat the victim. Campbell had difficulty at trial, however, with names and events, saying that he did not remember any of the names of the people involved in the beating. But he did acknowledge at trial that he had given a written statement to police on January 3, 2000, about the incident. According to Campbell's written statement, he knew from the neighborhood four of the five men who beat the victim. They were Maurice Thomas, Pee Wee (a.k.a. Edward Durant), Hip Hop, and Kevin. Campbell identified defendant as Hip Hop at trial.

Campbell's written statement further indicated that during the encounter, Pee Wee struck the victim with a stick three times. Campbell described the stick used to beat the victim as a piece of cut lumber. At one point, the victim got on his feet and ran. But Thomas, Pee Wee, Kevin and defendant chased him around a building where the others began beating him again. When the victim fell to the ground, defendant began striking him with his feet. At one point, Pee Wee went through the victim's pockets. While Campbell was watching the beating, Thomas asked Campbell to act as lookout for police, but Campbell refused. When the beating ended, defendant picked up the victim by the collar and pants and tossed him into a garbage Dumpster. Campbell denied participating in the beating and denied that the victim's sister, Samara Sadler, was present.

Other evidence presented revealed that police conducted a lineup on January 22, 2000, in which Campbell identified defendant. Later that day, police confronted defendant with the fact of that identification. Defendant then gave a written statement to an assistant State's Attorney in which defendant admitted his involvement in the incident. According to that statement, defendant was "hanging out" in the area when he saw Maurice Thomas bring the victim outside from the building. The victim broke free of Maurice's grasp, ran around the back of the building and entered a hallway on the first floor. Maurice ran after him, and Maurice and Pee Wee proceeded to beat the victim. Defendant "kept watch" from about two feet away to make sure no one saw what was going on or tried to interfere. After Thomas and Pee Wee finished the beating, the victim was lying face down and unconscious. Defendant then grabbed him by the back of his pants and shirt and threw him into a Dumpster.

Samara Sadler, sister of the victim, testified for the defense. She observed the victim come out of the building with Campbell and Maurice Thomas. Campbell and Thomas then began hitting the victim. She knew both Campbell and Thomas from the neighborhood. The group ran around the building and Sadler followed. When she got there, she observed the victim lying on the ground and unconscious. Two or three persons were around the victim, and she did not know if one of them was defendant. She knew defendant from the neighborhood, but testified that she did not see defendant strike the victim at any time.

During its closing argument, the State argued that it was not necessary that it prove defendant intended to kill the victim, but only that defendant or one for whom he was accountable combined to do an unlawful act, such as commit an aggravated battery and that the victim was killed by one of the parties committing that act. Because defendant was a part of the aggravated battery, he was legally responsible for the victim's death. The State noted that there were three options for first degree murder, but it only had to prove one. The State further argued that Durant (Pee Wee) knew there was a strong probability of death when he hit the victim with a board and that defendant was accountable. However, even if the jury did not believe this, defendant was still guilty of murder if he or someone he was accountable for committed aggravated battery.

The jury was subsequently instructed on all three theories of first degree murder. Defendant objected to the instructions at trial on the basis that they contained "accountability language." Defendant, however, did not object at trial to the instructions on the basis that they improperly informed the jury that it could convict defendant of felony murder based on aggravated battery. Defendant also did not object to the submission of a general verdict form. The jury returned a general verdict form finding defendant guilty of first degree murder, and defendant was ultimately sentenced to 25 years in prison.

Defendant filed a posttrial motion, claiming that the trial court erred in ruling on the *Batson* issue that arose after the State's use of a peremptory challenge to an African American venireman. Defendant additionally argued that the court erred in giving jury instructions that informed the jury that it could convict defendant of felony murder based on aggravated battery. Also, defendant argued that he was denied the effective assistance of trial counsel when counsel failed to request a special verdict form. The trial court denied the motion.

Defendant appealed, first contending that the cause should be remanded for a new *Batson* hearing because the trial court improperly collapsed the three-step process. Defendant's second contention was that the trial court erred in instructing the jury that it could find him guilty of felony murder predicated on aggravated battery.

The appellate court first set out the three-step process for a *Batson* claim as follows: (1) defendant must make a *prima facie* showing that

the prosecutor exercised peremptory challenges on the basis of race; (2) the burden then shifts to the prosecutor to provide a race-neutral reason for excluding the juror in question; and (3) the trial court then weighs the evidence and determines if the defendant proved purposeful discrimination. See No. 1–05–1251 (unpublished order under Supreme Court Rule 23). The appellate court then found that the State's proffered reason was valid and rejected defendant's claim that the cause should be remanded for a *Batson* hearing. In so doing, it affirmed the trial court's finding that the prosecutor's stated reason for excluding Hicks was race neutral. The appellate court did not address whether the trial court failed to consider the third stage of the *Batson* analysis. Instead, the appellate court itself looked at jurors who gave answers similar to venireman Hicks' answers about whether they could be fair, and it then determined from its review of the record that each of these jurors possessed additional characteristics that might have prompted the State to find them acceptable; therefore, it concluded that the State's articulated reasons were not pretextual. See No. 1–05–1251 (unpublished order under Supreme Court Rule 23).

The appellate court next considered defendant's claim that the trial court committed reversible error in instructing the jury on felony murder predicated on aggravated battery where the predicate felony is inherent in the act of murder itself. See *People v. Morgan*, 197 Ill. 2d 404, 447 (2001). The appellate court found that even assuming that the trial court erred in so instructing the jury, any error was harmless. No. 1–05–1251 (unpublished order under Supreme Court Rule 23), citing *People v. Ruiz*, 342 Ill. App. 3d 750, 756 (2003). The court noted that Illinois law is clear that " 'where an indictment contains several counts arising out of a single transaction, and a general verdict is returned[,] the effect is that the defendant is guilty as charged in each count ***.' " No. 1–05–1251 (unpublished order under Supreme Court Rule 23), quoting *Morgan*, 197 Ill. 2d at 448, quoting *People v. Thompkins*, 121 Ill. 2d 401, 455 (1988). Thus, if defendant is charged with intentional murder, strong probability murder and felony murder, and the jury returns a general verdict finding defendant guilty of murder, it raises a presumption that the jury found that the defendant committed the most serious crime charged, which is intentional murder. No. 1–05–1251 (unpublished

order under Supreme Court Rule 23), citing *Morgan*, 197 Ill. 2d at 448. Any error in instructing the jury on felony murder was therefore harmless. No. 1–05–1251 (unpublished order under Supreme Court Rule 23).

## ANALYSIS

On appeal to this court, defendant first argues that we should remand the cause for a *Batson* hearing because the trial court improperly collapsed the methodical three-step *Batson* approach. Defendant claims that the trial court omitted the first step altogether and went directly to the second step of asking the State to provide its reasons for excusing Hicks. According to defendant, the trial court then found the reason race neutral, but stopped there without considering the third step, at which it was required to evaluate the prosecutor's explanation in light of all the circumstances of the case and determine if defendant had proven purposeful discrimination. Defendant contends that the prosecutor's stated reason for striking Hicks was pretextual, as it applied equally to jurors who were not struck. Specifically, defendant now points to answers given by jurors Roy Hunninghaus, Kimberly Katulka and Peter Pick, and claims that these jurors equivocated in the same manner as Hicks when asked whether they could be fair.

The relevant portions of the record show that Hunninghaus gave an identical response to Hicks, whereas Katulka and Pick gave arguably similar responses to those given by Hicks. The prosecutor asked Hunninghaus if he could be a fair juror and he responded, "I think so." The prosecutor did not follow up this answer with any further questioning. Defense counsel, however, did follow up by quoting the juror's answer back to him and asking whether he had "any hesitation about [his] ability to be fair" to both sides in the case. Hunninghaus responded, "No, I don't."

The prosecutor asked Katulka whether she would sign a guilty verdict if the State met its burden to prove defendant guilty beyond a reasonable doubt, and she answered "Yes." The prosecutor then asked her if she could be fair to both sides in the case, and she responded, "I believe I can." Defense counsel later asked Katulka about her service on a jury in another case in 2001 and whether there

was anything about that case that would affect her ability to be fair in the present case. Katulka said, "I don't believe so, no." Defense counsel then asked her whether she would have any problem finding defendant not guilty if, after hearing the evidence, she believed that the State had not proven its case beyond a reasonable doubt. She replied, "No."

Pick was not asked by counsel whether he could be fair generally or whether he could be fair to the State in particular. Instead, defense counsel asked Pick whether he could be fair to defendant. Pick answered, "Yes, I think so."

I. *Batson* Procedure

The United States Supreme Court in *Batson* set forth a three-step process for evaluating whether the State's use of a peremptory challenge resulted in removal of venirepersons on the basis of race. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 88, 106 S. Ct. at 1723; *People v. Williams*, 209 Ill. 2d 227, 244 (2004). To determine at the first step whether racial bias motivated a prosecutor's decision to remove a potential juror, a court must consider "the totality of the relevant facts" and "all relevant circumstances" surrounding the peremptory strike to see if they give rise to a discriminatory purpose. *Batson*, 476 U.S. at 93-94, 96-97, 90 L. Ed. 2d at 85-86, 88, 106 S. Ct. at 1721, 1723. In *Johnson v. California*, 545 U.S. 162, 170, 162 L. Ed. 2d 129, 139, 125 S. Ct. 2410, 2417 (2005), the Supreme Court noted that the threshold for making out a *prima facie* claim under *Batson* is not high: "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." See also *Miller-El v. Dretke*, 545 U.S. 231, 239, 162 L. Ed. 2d 196, 213, 125 S. Ct. 2317, 2324 (2005) (*Miller-El II*) (a defendant can "make out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial").

The " 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " *Snyder v. Louisiana*, 552 U.S.

___, ___, 170 L. Ed. 2d 175, 181, 128 S. Ct. 1203, 1208 (2008), quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). However, the mere fact of a peremptory challenge of a black venireperson who is the same race as defendant or the mere number of black venirepersons peremptorily challenged, without more, will not establish a *prima facie* case of discrimination. *People v. Heard*, 187 Ill. 2d 36, 56 (1999); see also *People v. Rivera*, 221 Ill. 2d 481, 512 (2006) (*Rivera I*) (the number of persons struck takes on meaning only when coupled with other information such as the *voir dire* answers of those who were struck compared to the answers of those who were not struck).

Courts have held that an important tool in assessing the existence of a *prima facie* case is "comparative juror analysis," which examines "a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." See, *e.g.*, *Boyd v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006).

In *Snyder*, the Supreme Court, in the process of conducting its third-stage *Batson* analysis, compared an excluded black venire member who was the same race as the defendant with a white juror who was not excluded to determine that the State's explanation for the strike was pretextual, and the Court did so even though no comparison had been made at the trial level. *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 184-85, 128 S. Ct. at 1211-12. Similarly, in *Miller-El II*, the Court noted that comparative jury analysis is a powerful tool in assessing a *Batson* claim and that if "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241, 162 L. Ed. 2d at 214, 125 S. Ct. at 2325.

We see no reason why a comparative juror analysis would not also be a relevant factor in the totality of factors that must be considered in determining whether a *prima facie* case exists in the first instance. We caution, however, that neither *Snyder* nor *Miller-El* ruled that comparative juror analysis, standing alone, would necessarily be sufficient to prove purposeful discrimination. See *People v. Lenix*, 44 Cal. 4th, 602, 626, 187 P.3d 946, 963, 80 Cal.

Rptr. 3d 98, 118 (2008). Rather, comparative juror analysis was an *additional* form of evidence considered by the Supreme Court in both cases. See *People v. Lenix*, 44 Cal. 4th 602, 626, 187 P.3d 946, 963, 80 Cal. Rptr. 3d 98, 118 (2008). Thus, we believe that comparative juror analysis is just one factor in the totality of the circumstances that the court should take into consideration in considering the existence of a *prima facie* case.

In addition to comparative juror analysis, the following factors are also relevant in evaluating whether a *prima facie* case exists:

> (1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses. See *Rivera I*, 221 Ill. 2d at 501.

We again emphasize that the trial court looks at the totality of all the relevant facts and circumstances to determine whether they give rise to an inference of discriminatory purpose. *Rivera I*, 221 Ill. 2d at 500; *Batson*, 476 U.S. at 93-94, 96, 90 L. Ed. 2d at 85-86, 88, 106 S. Ct. at 1721, 1723. Once a *prima facie* showing has been made, the State must provide " ' "a race-neutral basis for striking the juror in question" ' " at the second stage of the *Batson* process. *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 180-81, 128 S. Ct. at 1207, quoting *Miller-El II*, 545 U.S. at 277, 162 L. Ed. 2d at 237, 125 S. Ct. at 2346 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.), quoting *Miller-El v. Cockrell*, 537 U.S. 322, 328, 154 L. Ed. 2d 931, 945, 123 S. Ct. 1029, 1035 (2003) (*Miller-El I*). A race-neutral basis means "an explanation based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866 (1991) (plurality op.). Defense counsel may then rebut the proffered explanation as pretextual.

*Williams*, 209 Ill. 2d at 244. Finally, at the third stage, the trial court must determine whether the defendant has shown purposeful discrimination in light of the parties' submissions. *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 180-81, 128 S. Ct. at 1207, quoting *Miller-El II*, 545 U.S. at 277, 162 L. Ed. 2d at 237, 125 S. Ct. at 2346 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.), quoting *Miller-El I*, 537 U.S. at 328-29, 154 L. Ed. 2d at 945, 123 S. Ct. at 1035; see also *Williams*, 209 Ill. 2d at 244. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Rice v. Collins*, 546 U.S. 333, 338, 163 L. Ed. 2d 824, 831, 126 S. Ct. 969, 974 (2006).

Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent will often be the demeanor of the attorney who made the peremptory challenge. *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 181, 128 S. Ct. at 1208, quoting *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869 (plurality op.). Additionally, as is the case here, a race-neutral reason for a challenge often invokes a juror's demeanor (*e.g.*, nervousness, inattention, the way words are emphasized to express differing meanings), making the trial court's firsthand observations of crucial importance. In such situations, the trial court must evaluate not only whether the prosecutor's demeanor belies discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 181, 128 S. Ct. at 1208. Generally, a trial court's ultimate conclusion on a *Batson* claim will not be overturned unless it is clearly erroneous; this deferential standard is appropriate because of the trial court's pivotal role in the evaluation process. *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 181, 128 S. Ct. at 1207-08. But this court has held that when the trial court acts *sua sponte* to conduct a *Batson* hearing, a bifurcated standard of review applies: the court's findings of fact, including any specific observations of record bearing on demeanor or credibility, will be accorded deference; however, the ultimate legal determination based on those findings is one that we make *de novo*. *People v. Rivera*, 227 Ill. 2d 1, 11-12 (2007) (*Rivera II*).

II. Application of *Batson* Procedure

-12-

In attempting to apply the above-mentioned principles to the facts before us, we find that our review is hampered by the inadequacy of the *Batson* hearing that was held below and the cause must therefore be remanded for a *Batson* hearing. Defendant now attempts to compare Hicks, the excluded African-American venireman in question, to jurors Hunninghaus, Katulka and Pick. Yet the race of these three jurors is not disclosed in the record. One might presume that they are not African-American–otherwise, the fact that they were accepted as jurors would render inane defendant's comparison argument, as it would be hard to fathom any racial motivation in striking Hicks if the other jurors who gave arguably equivocal answers were the same race as Hicks. But, on the other hand, we are not comfortable with presuming facts not contained in the record, and defendant has made no representation before this court that the jurors in question are in fact nonblack. See *People v. Andrews*, 146 Ill. 2d 413, 429-30 (1992) (this court rejected the State's suggestion that defendant should have been required to call the excluded venirepersons to testify at the *Batson* hearing to establish their race where defense counsel had made a record at the original *voir dire* in the form of his own statements about the number of strikes used against black venirepersons); *People v. Townsend*, 275 Ill. App. 3d 200, 206 (1995) (the court had no basis for making a comparison between seated jurors and rejected venire members where defendant failed to make a record of the racial makeup of the seated jurors, either before or after the *Batson* objection); *People v. Gray*, 252 Ill. App. 3d 362, 372 (1993) (court would not engage in speculation and conjecture where the defendant established only that two African Americans were excluded from the jury but failed to preserve the record as to the race of the jury or the other excluded venire members). Nor do we know for sure from the record such facts as the total number of African Americans in the venire compared to the total number that served on the jury, or the total number of African Americans that were struck by use of peremptory challenges by the State.

Ordinarily, the party asserting a *Batson* claim has the burden of proving a *prima facie* case and preserving the record, and any ambiguities in the record will be construed against that party. *Rivera I*, 221 Ill. 2d at 512; *People v. Henderson*, 142 Ill. 2d 258, 279-80

-13-

(1990). A different approach, however, is taken when a trial court acts to conduct a *Batson* hearing *sua sponte*. In *Rivera I*, this court held that a trial court has standing to raise a *Batson* issue *sua sponte* in the appropriate circumstances. *Rivera I*, 221 Ill. 2d at 504. But *Rivera I* further noted that a *prima facie* case of discrimination "must be abundantly clear before a trial court acts *sua sponte*." *Rivera I*, 221 Ill. 2d at 505. When a trial court acts *sua sponte* to conduct a *Batson* hearing, it " 'must make an adequate record consisting of all relevant facts, factual findings, and articulated bases' for its finding of a *prima facie* case." *Rivera II*, 227 Ill. 2d at 5, quoting *Rivera I*, 221 Ill. 2d at 515.

We believe that the present situation resembles *Rivera I*, where the trial court raised a *Batson* problem *sua sponte*. Here, the trial court conducted proceedings off the record and we do not know what defense counsel argued. All we know for certain is that the trial court began a *Batson* proceeding by asking the State to supply an explanation for its challenge to Hicks without a "formal" objection by defense counsel. It would have been better had the trial court plainly asked defense counsel, "Do you want to make a *Batson* objection, yes or no?" If no, the court should have dropped the matter unless it was "abundantly clear" that a *prima facie* case existed. If indeed defense counsel did want to make an objection, the court should have proceeded with the *Batson* hearing by first hearing from defense counsel as to whether a *prima facie* case existed. It is clear that the trial court felt that no *Batson* motion had been made and that it could therefore conduct its own unorthodox inquiry *sua sponte*, to be "fair to the defense and the court system." The court then asked the State to offer a reason for its peremptory challenge to Hicks, which the State complied with by asserting that Hicks had equivocated in his answer to whether he could be a fair juror.

Once the trial court began its inquiry and the State had offered its reason for the strike, the record shows, for the first time that at least one of defendant's attorneys did desire to make a *Batson* objection. The trial court at that point, however, became preoccupied with eliciting from defense counsel an admission that he had in fact not made a formal *Batson* objection while off the record. This seems to have clouded the rest of the proceedings, preventing both sides from making full arguments on their respective positions. After

-14-

establishing that no *Batson* objection had been made, the trial court then drifted into an inquiry into the State's use of a peremptory challenge against another African American venireman, Andre Honorable.[1] When the trial court returned the discussion to Hicks, it simply found that the State's reason was race neutral, noting that Hick's comment, "he thinks he could be fair," was a race-neutral reason. The trial court's assessment that the State's reason was race neutral is no doubt true, as a "neutral explanation" means any "explanation based on something other than the race of the juror." See *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866 (plurality op.). The trouble is that the court stopped its analysis there. It never did reach the third stage of *Batson*, which requires the court to consider whether defendant has shown purposeful discrimination in light of the parties' submissions. The trial court never considered defendant's argument that the reason offered by the State was pretextual in light of defendant's argument that other jurors had equivocated in a similar fashion. Instead, it stopped its analysis upon being given a race-neutral explanation, ruling that it was "enough."

The trial court's comments in ruling on defendant's posttrial motion also do not engender confidence that the court moved beyond the second step to consider whether the reason proffered by the State was pretextual and whether the defendant had met his burden of proving purposeful discrimination. In denying defendant's posttrial motion based on *Batson*, the court simply stated as follows: "[L]ooking at *Batson*, again I was there, I find that there was–*Batson* to me is an outstanding case and any violation of it is reprehensible, I found there was no violation of *Batson*, so that's my ruling on that."

The trial court also did not make any findings with respect to the credibility of the prosecutor, or with respect to the demeanor of Hicks and the accepted jurors who allegedly equivocated in their answers.

---

[1]The State initially moved to excuse Honorable for cause because he hesitated before stating that he could not remember if he or a family member had ever been a victim of a crime, even though he marked "yes" to that question on his juror questionnaire. The trial court denied the challenge for cause. The State then used a peremptory challenge to excuse Honorable. Defendant did not object to that strike and he makes no *Batson* argument with respect to Honorable before this court.

Although it is true that defendant did not specifically name the jurors in question, it is also true that the trial court did not ask defense counsel to elaborate or provide any more detail as to his argument on pretext. Again, the judge had the obligation to make a complete record for our review in this setting where he was essentially acting *sua sponte*. What the record does show is that the trial court collapsed the three-step *Batson* procedure into one step that looked only at whether the State could offer a race-neutral explanation for the strike. Under the particular circumstances here, we believe that the appropriate remedy is a remand for a full *Batson* hearing that begins with the first stage of the *Batson* process. We realize that determinations of credibility and demeanor (*e.g.*, facial expressions and the inflection and tone of voice when answering questions) may be extremely difficult on remand, which will now be more than four years after the trial. Nevertheless, a firsthand observation of demeanor is likely to be the only thing that can give "sufficient content" to Hick's and Hunninghaus' statements–"I think so"–when asked if they could be fair jurors. See *Snyder*, 552 U.S. at ___, 170 L. Ed. 2d at 189, 128 S. Ct. at 1215 (Thomas, J., dissenting, joined by Scalia, J.) ("a firsthand observation of demeanor is the only thing that could give sufficient content to Ms. Scott's ultimate response–'I think I could' [citation]–to determine whether the prosecution's concern about her willingness to impose the death penalty was well founded"). The trial court on remand might also have occasion to assess any differences in the follow-up questions and answers given by the respective jurors as compared to Hicks on the issue of their fairness as potential jurors.

Defendant urges that we remand only for a stage *three Batson* hearing because the first stage became moot once the trial court asked the prosecutor to State the reason for his challenge. But this argument must be rejected. Defendant bases his claim on the rule expressed by the Supreme Court in *Hernandez*: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges *and the trial court has ruled on the ultimate question of intentional discrimination*, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (Emphasis added.) *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866 (plurality op.). This rule does not govern the present situation, of course, because, as we have already concluded, the trial court never reached the third

stage of the process and therefore did not rule on the ultimate question of intentional discrimination. Accordingly, we believe that the appropriate remedy is a remand for a full *Batson* hearing, which begins with stage one and could potentially end there, depending on whether defendant establishes a *prima facie* case.

Finally, we note that the *Batson* hearing below was conducted prior to this court's decisions in *Rivera I* and *II* and prior to the United States Supreme Court's decisions in *Snyder* and *Miller-El II*. Although these cases do not represent a change in the area of *Batson* law, they do spell out some important principles that should help guide the parties and the court on remand.

## CONCLUSION

In light of our ruling that the *Batson* proceedings below were inadequate, we remand the cause for a new *Batson* hearing. That necessarily means that we do not now reach the remaining pending issues in this opinion. See, *e.g.*, *Rivera I*, 221 Ill. 2d at 516; *People v. Wiley*, 156 Ill. 2d 464, 477 (1993); *People v. Garrett*, 139 Ill. 2d 189, 195 (1990). On remand, the circuit court shall articulate proper findings of fact and conclusions of law and shall file them with the clerk of this court within 60 days of the issuance of the mandate in this matter, accompanied by the record of the proceedings on remand. See *Rivera I*, 221 Ill. 2d 481. After the *Batson* proceedings on remand have been completed, this court will announce its judgment on any pending issues.

*Cause remanded with directions*.