NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200042-U

NO. 4-20-0042

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 3, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Macon County |
| SANTONIO BYARS, | ) | No. 19CF793 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

## ORDER

¶ 1    *Held*: (1) The evidence was sufficient to prove defendant was unjustified using deadly force, and to convict the defendant of second degree murder. (2) The circuit court did not err by rejecting defendant's *Batson* challenges. (3) By not raising the issue below, defendant has forfeited any argument the circuit court's rulings on defendant's *Batson* issues violated defendant's constitutional right to equal protection.

¶ 2    On November 21, 2019, a jury convicted defendant, Santonio Byars, of second degree murder (720 ILCS 5/9-2(a)(2) (West 2018)). Defendant filed a motion seeking a new trial, arguing that he had not been proven guilty beyond a reasonable doubt, and alleging the circuit court committed error by permitting the State to exercise two peremptory challenges to remove two African-American members of the venire over defendant's objections based on *Batson v. Kentucky*, 476 U.S. 79 (1986). The court denied the motion, noting the State dismissed all jurors

who said they had a "neutral" view of law enforcement. On January 6, 2020, the circuit court sentenced defendant to 10 years of imprisonment.

¶ 3    Defendant raises three issues. First, he claims the State failed to prove that defendant was not justified in using deadly force. Second, he claims the State's exercise of peremptory challenges to remove two African-American members from the venire because they held "neutral" opinions of law enforcement were *Batson* violations. Third, defendant alleges the removal of the two members of the venire violated defendant's right to equal protection of the laws.

¶ 4    We affirm the judgment of the circuit court.

¶ 5                                I. BACKGROUND

¶ 6    On November 4, 2018, defendant stabbed Tobby Buhs Jr. (Buhs) during an argument, causing Buhs's death shortly thereafter. The State charged defendant with second degree murder, alleging defendant believed circumstances existed justifying the killing, pursuant to the right to use force in defense of a person (720 ILCS 5/7-1 (West 2018)), but that defendant's belief was unreasonable (720 ILCS 5/9-2(a)(2) (West 2018)). The charging grand jury declined to indict defendant for first degree murder.

¶ 7    The matter proceeded to jury trial on November 18, 2019.

¶ 8                                A. Jury Selection

¶ 9    During jury selection, the State asked the first member of the first panel about their "general opinion of law enforcement", and specifically whether this prospective juror liked, did not like, or was neutral toward law enforcement. The State asked each subsequent prospect on this panel simply of their "general opinion of law enforcement." Three of the first panel members answered "neutral." The circuit court struck one of these three for cause based on the State's

motion, as she indicated she could not be fair. The State then exercised its first peremptory challenge to remove another member of the panel, who was a white male and who answered "neutral." As to the third of these three members who answered "neutral," the State also sought to exercise its second peremptory challenge. Defendant objected because this last prospect was African-American.

¶ 10        The State responded it sought to remove this member because she said she had a "neutral" opinion of law enforcement, noting it had removed a white male for the same reason. Further, the State argued it would have sought to remove the other who gave the same answer if the circuit court had not granted the State's motion to strike for cause.

¶ 11        The circuit court noted defendant had made a *prima facie* case of purposeful discrimination based on race, and that the State gave a credible race-neutral reason for the exercise of the peremptory challenge. The court granted the State's request and excused this juror.

¶ 12        Upon the seating of the next panel of prospective jurors, the State asked the first and each subsequent member about their "general opinion of law enforcement." Two said "neutral," one said "fine," and several said "respectful" or gave a positive response of one sort or another. The State moved to excuse for cause one African-American member of this panel who said his opinion was "fair" but also was on medication which made his memory "foggy" and did not believe he could "follow" the proceedings. Defendant objected, but the circuit court excused this member of the panel.

¶ 13        The State exercised its third peremptory challenge as to one of the prospective jurors, who had answered the law enforcement question with "neutral." Defendant objected, noting this member was African-American. The State noted its position was the same as before given the "neutral" opinion of law enforcement. As well, the State advised it would also move to excuse

another panel member who answered "neutral" and was a white male. After a short recess the circuit court took to research the issue, the State again noted it had not treated any of the prospective jurors differently. The State proffered it was no secret it prefers jurors who have a positive view of law enforcement and presumed the defendant preferred those who did not. The State advised it asks the same question in every felony case it tries. The court asked the State to clarify how a neutral view of law enforcement had anything to do with the matter, to which it responded it anticipated it would play video of defendant's interrogation during which defendant stated he fled the scene because he did not believe the police would treat him fairly. The State added more broadly that they like a juror who has a positive view of the police as law enforcement constitutes the majority of its witnesses, and is therefore always something the State believes is relevant.

¶ 14    The circuit court confirmed defendant agreed the court kept no prospective juror from the first panel who gave the neutral answer, though one the court excused for cause. The court summarized the parties had been presented with 27 possible jurors, three of which were African-American. One was excused for medical issues, and the other due to the State's peremptory challenge. The court noted the State had been consistent seeking to excuse those who answered "neutral." The court permitted the State to exercise its third peremptory challenge to excuse an African-American prospective juror who had a "neutral" opinion of law enforcement.

¶ 15    Once the selection process moved to choosing alternate jurors, defendant exercised a peremptory challenge to excuse one. The State then exercised a peremptory challenge as to the white male who the State previously noted it would seek to remove for his "neutral" opinion of law enforcement.

¶ 16        The circuit court called more prospective jurors in, from which to select two alternates. The State proceeded with questioning in the manner it did with the first panel, asking the first prospective juror about her general opinion of law enforcement and whether she liked, disliked, or was neutral. One the State asked if the prospect had a positive opinion, and the remainder the State asked their general opinions of law enforcement. Several answered they held "neutral" opinions. One who was neutral remained as the first alternate as the parties had no remaining peremptory challenges for the first alternate. As to the second alternate, the State exercised a peremptory challenge to remove a white male prospective juror who advised he had a "neutral" view of law enforcement.

¶ 17        In summary, the circuit court permitted the State to exercise peremptory challenges to excuse five prospective jurors based on their "neutral" views of law enforcement. Three of these were white, and two were African-American. The court also removed one African-American for cause on the motion of the State due to health issues which prevented the member from following the proceedings.

¶ 18                              B. The Evidence

¶ 19        The State presented 13 witnesses, whose testimony as relevant to the issues herein we summarize below.

¶ 20        On November 4, 2018, in the early morning hours, a police officer responded to a dispatch call directing him to a parking lot in Decatur, Illinois. Upon arrival, the officer found Buhs lying on the ground, unresponsive, and covered with blood. Three other individuals who had been with Buhs throughout the evening were also present at the parking lot. One of these individuals, Anna Loesch (Loesch) related the story of the evening's events to the jury, which generally tended to show what transpired.

¶ 21    Loesch testified she, Wyatt Ward (Ward), Kaylan Riley (Riley), and Buhs went to a birthday party where they all consumed alcohol. After leaving, the four of them went to two different taverns. On leaving the second bar, Ward was driving, and while stopped at a traffic signal, Buhs asked the driver of another vehicle if they wanted to race for money. Once the light changed, Ward drove over the speed limit to the next light and arrived before the other vehicle. When the other vehicle arrived, Buhs asked the occupants of the other vehicles for the money, but the other vehicle drove away. Ward followed.

¶ 22    Loesch testified the other vehicle pulled into a parking lot, and Ward parked behind the other vehicle. Ward and Buhs got out of the vehicle, and two men got out of the other. Loesch heard Buhs talking to the passenger of the other vehicle, later identified as defendant. After watching the discussion for some period, Riley exited the vehicle and attempted to persuade Buhs to get back in the car. Loesch saw Buhs push Riley off to the side. Loesch did not see any physical contact between Buhs and defendant.

¶ 23    Shortly thereafter, Buhs walked back to the car and advised he needed to go to the hospital as he had been stabbed. Buhs lost consciousness on the way to the hospital, so Ward parked in the parking lot where the police officer found them.

¶ 24    Ward testified to a similar version of events. As well, Ward stated he parked behind the vehicle occupied by defendant, and there was no obstruction that would have prevented defendant's vehicle from driving away. Ward stood near the front of the car on the driver's side, but Buhs and defendant stood on the passenger side of defendant's car near its front. Ward could not hear what defendant and Buhs discussed, and was "not really" watching Buhs and defendant. Ward testified defendant and Buhs were not yelling, but were facing each other "with space between them." Neither was being physical until shortly thereafter.

¶ 25    Ward did not see Buhs display any weapon, nor did he see anyone else do so. When the discussion between Buhs and defendant became physical, Ward heard "a shove" but did not observe it. Instead, Ward saw Buhs and defendant moving and "could tell somebody got shoved." Buhs was moving and holding his side. Ward noted no other sign of physical contact between defendant and Buhs.

¶ 26    Riley echoed the same version as Ward and Loesch. She testified she saw nothing in front of defendant's car that would have prevented defendant and the driver of the car from leaving. Riley initially stayed in the car but could tell from defendant's and Buhs's body language they were arguing. Riley could not hear the discussion, and did not observe Buhs touch defendant. At one point, Riley got out of the car and grabbed Buhs's arms to try to persuade him to get back in the car. Buhs would not and kept arguing with defendant. Again, Riley did not know what Buhs and defendant were saying, though she characterized defendant's tone as angry. When Buhs would not return to the car, Riley faced defendant and told him "we were sorry," that Buhs had been drinking, and that they were leaving. At this time, Riley testified defendant was holding a knife to his chest and was "smirking."

¶ 27    After Riley spoke to defendant, Buhs pushed her away, and defendant and Buhs came into contact, chest to chest, with each other. Riley did not know who initiated the contact, but this was the only time she observed any contact between the two.

¶ 28    Scott Denton (Denton) testified he was the forensic pathologist who performed the autopsy on Buhs. Denton related Buhs had two stab wounds, one on the right chest and one on his right forearm. Denton testified the chest wound was over an inch wide and penetrated four and a half inches into the chest. Denton advised the chest wound cut through the skin, through muscle, through three ribs, the right lung, and finally into Buhs's heart. Such wound collapsed Buhs's right

lung, and would have caused abnormal breathing. A wound to the heart such as the one Buhs suffered generally causes death within a few minutes, according to Denton. And in Buhs's case the chest wound was a fatal wound.

¶ 29    As for the wound to the forearm, Denton testified it also cut through the skin and muscle and severed a tendon. This wound, Denton said, was consistent with a defensive wound, and though painful and requiring surgery, was not fatal. Denton also testified Buhs was carrying a pocket knife, which had a clip that was visible on the outside of Buhs's pants. Finally, Buhs had a blood alcohol level of 0.147.

¶ 30    Detective Barry Hitchens obtained copies of surveillance videos that depicted some of the interaction between defendant and Buhs. Several of the witnesses viewed the videos and testified about what they showed. Although the videos depict some of what transpired, they do not show Buhs and defendant talking or otherwise interacting.

¶ 31    Detective Chad Reed interviewed defendant on December 13, 2018. The recording of the interview was shown to the jury. Defendant's statements generally reflect the version described herein. Marvis Parker (Parker), who is defendant's brother, was the other individual in the car with defendant and was the driver. According to defendant, Parker and defendant did not think Buhs was serious about racing. Parker did advise Buhs they had not agreed to race and drove away. Defendant stated Ward and the others followed Parker and defendant and got very close to their vehicle. Defendant advised that during his discussion with Buhs, he told Buhs he had a knife and did not want to use it. Defendant carried the knife for use during his work driving a truck.

¶ 32    Defendant stated he showed Buhs the knife after he saw Buhs fiddling with his pocket. Defendant claimed Buhs ran at him, but defendant pushed him back. Buhs fell, and when he got up, defendant saw something in his hand. Defendant says Buhs ran at him again and swung

at him, at which point defendant stabbed Buhs once in the arm. Defendant says Buhs then walked away saying he had been stabbed, and defendant saw Buhs put something in his pocket.

¶ 33    Defendant stated he needed to protect himself, and that Buhs was taller and bigger than defendant. Defendant felt since Ward and Buhs were white, and defendant and Parker were black, Ward and Buhs must have had firearms which gave them the confidence to follow defendant. Defendant thought Buhs had a weapon in his hand which Buhs had covered with a towel or hat.

¶ 34    When defendant went to the police station, he brought the knife with which he stabbed Buhs.

¶ 35    At the close of the State's evidence, the State rested and moved to dismiss another count of second degree murder. The second count alleged defendant killed Buhs while under a sudden and intense passion flowing from serious provocation.

¶ 36    Defendant called his brother Parker as a witness. Parker testified "they" were yelling at him at the stoplight that Parker had lost the race. The other car then followed Parker to the parking lot, and in doing so cut him off. In the parking lot, Parker testified there was no obstruction preventing him from driving away from the lot. Parker testified the discussion between Buhs and defendant was "pretty loud." Parker observed Buhs was taller and heavier than defendant. After a few minutes of Buhs insisting Parker and defendant needed to pay for losing the race, Parker saw Buhs run at defendant, and heard defendant yell at Buhs to "get back and get off me." Parker testified that Buhs retreated and ran at defendant again. Defendant repeated himself before Buhs came walking back stating he had been stabbed. Parker did not observe either defendant or Buhs shove the other. After Buhs left, Parker and defendant went to a liquor store and bought beer, cigarettes, and a bottle of liquor.

¶ 37    Defendant did not testify. The jury found defendant guilty of second degree murder.

¶ 38                    C. Posttrial Proceedings

¶ 39    Defendant filed a motion for a new trial, arguing the State had not proven defendant guilty beyond a reasonable doubt, and asserting the circuit court erred by allowing the State to exercise two of its peremptory challenges to excuse two African-American prospective jurors. At the hearing on the motion, defendant argued he was "deprived of having any jurors of color on the jury panel." Defendant argued having people of color was important as they would understand such things as why defendant was afraid to come to the police. The circuit court denied defendant's motion, noting the State sought to dismiss all prospective jurors who said they had neutral opinions about law enforcement.

¶ 40    The circuit court sentenced defendant to 10 years of incarceration on January 6, 2020. From that order, defendant appealed.

¶ 41                    II. ANALYSIS

¶ 42            A. Sufficiency of the Evidence and Standard of Review

¶ 43    We will not reverse a conviction on appeal "for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *People v. Harris*, 2018 IL 121932, ¶ 26. We view the evidence in the light most favorable to the State, and consider whether any "rational trier of fact" could have concluded the evidence established the crime's essential elements beyond a reasonable doubt. *Id.* We do not retry the accused, and we draw any reasonable inference in favor of the State. *Id.* Throughout, the fact finder's responsibility is to weigh the evidence, resolve conflicts within the evidence, and draw reasonable inferences therefrom. We will not substitute our judgment "for that of the trier of fact

on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 44   The arguments of the parties herein necessarily focus "on the reasonableness of defendant's belief that the circumstances warranted the use of deadly force." *People v. Lee*, 213 Ill. 2d 218, 225 (2004). The jury's conclusion the circumstances did not warrant such force required the jury to make credibility determinations. *Id.*

¶ 45   Thus, the standard of review is whether "considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *Id.*

¶ 46                  B. The Evidence Was Sufficient to Convict Defendant

¶ 47   The jury found defendant guilty of second degree murder, in that defendant believed circumstances existed justifying the murder of Buhs, pursuant to the right to use force in defense of a person (720 ILCS 5/7-1 (West 2018)), but that defendant's belief was unreasonable (720 ILCS 5/9-2(a)(2) (West 2018)). Defendant asserts the State failed to prove defendant was unjustified in utilizing deadly force to defend himself.

¶ 48   Specifically, defendant argues the evidence shows his conduct was reasonable because the vehicle Buhs occupied followed defendant and Parker, parked behind defendant and Parker, and Buhs quickly exited the vehicle after parking. Defendant implies Riley thought Buhs was aggressive too, given that Riley got out of the car and tried to get Buhs back into the car, which Buhs refused. Riley, defendant argues, then felt compelled to apologize to defendant for Buhs's actions.

¶ 49     Defendant suggests his conduct was appropriate as Parker supported defendant's statement to the police that Buhs charged him not once but twice. As well, Parker testified defendant, when charged, told Buhs to get off of him.

¶ 50     Defendant proffers he thought he needed to protect himself as Buhs was taller and heavier than defendant, which Parker confirmed. Defendant argues Buhs and his companions are white, and Parker and defendant are African-American. Thus, defendant believed Buhs must have had a firearm. Defendant thought Buhs had a weapon in his hand concealed by a towel or a hat, and claimed defendant only displayed his knife when he thought Buhs had one too.

¶ 51     In sum, defendant urges he reasonably thought Buhs was the aggressor, and stabbed Buhs only after Buhs charged him a second time.

¶ 52     The State posits the video shows the two vehicles slowly pulling into the parking lot where the stabbing occurred, and those exiting the vehicles doing so calmly. The video, the State argues, shows the parties calmly standing around, and does not suggest any confrontation between defendant and Buhs. Those with Buhs testified defendant and Buhs were speaking to each other from several feet apart. Buhs's companions did not see any physical contact between defendant and Buhs either, until the single instance when Buhs reported he had been stabbed. Thus, the State argues it was defendant who unjustifiably stabbed Buhs when there was no threat of death or great bodily harm.

¶ 53     The evidence also demonstrates that defendant and Parker could have left the parking lot on arrival or after if they had felt threatened, as Ward and Riley testified there was no object that would have prevented Parker from doing so. Further, Ward testified he could not hear the defendant and Buhs talking, and they were not yelling. Riley could tell the two were arguing, but could not hear either defendant or Buhs. Ward related Buhs did not display any weapon, nor

- 12 -

did the group have any with them. Ward did not observe Buhs do anything to threaten defendant. Riley testified when she attempted to get Buhs back in the car that defendant's voice sounded angry, and that when she apologized to defendant for Buhs's conduct, defendant was smirking and holding a knife.

¶ 54     Scott Denton, the forensic pathologist who conducted the autopsy on Buhs, testified he would characterize the wound on Buhs's right forearm as a defensive wound. Denton described the fatal wound as four and half inches deep. Denton related the knife cut through skin, muscle, three ribs, and the right lung before entering the heart. The right arm wound, Denton said, went through the skin, and cut both muscle and tendon. Denton described how the chest wound collapsed the right lung, and likely resulted in abnormal breathing. Denton would have expected the heart wound to have caused death within a few minutes, and the arm wound to have caused significant pain.

¶ 55     Therefore, the jury could have chosen to believe the situation was calm, and that Buhs and defendant were having a calm conversation. It could have concluded defendant should have fled if he was concerned, or that he was not justified using deadly force. The trier of fact could have chosen to reject defendant's version that Buhs was the aggressor, threatened defendant, and charged at defendant twice such that defendant felt compelled to protect himself. It could have instead accepted the version of events of those who were with Buhs. The jury could have considered Denton's characterization of the arm wound as defensive. In short, all of these issues and others were within the jury's purview to sort out and sift through.

¶ 56     We believe the evidence was sufficient for the jury to conclude defendant was unjustified using deadly force, and to convict the defendant of second degree murder. The jury believed the State's version of events, and rejected the defendant's. We will not substitute our

judgment for that of the jury on the weight given to the evidence or the credibility of the witnesses. Although defendant presented a different version of events than the State, that does not meet the standard for reversal.

¶ 57                          C. The State's Use of Peremptory Challenges

¶ 58        Defendant argues the circuit court committed error by permitting the State to exercise two of its peremptory challenges to remove African-American prospective jurors, who said they had "neutral" opinions of law enforcement. Defendant urges the State's questions asking for prospective jurors' opinions of law enforcement is a pretext for purposeful discrimination.

¶ 59        We will not reverse a circuit court's ruling on a *Batson* challenge unless it is clearly erroneous. *People v. Davis*, 231 Ill. 2d 349, 364 (2008). Such deference is appropriate "because of the trial court's pivotal role in the evaluation process." *Id.*

¶ 60        Broadly speaking, *Batson* requires a three-step process when a defendant challenges the State's use of a peremptory challenge as unlawfully motivated by race. *Batson,* 476 U.S. at 96. First, defendant must make a *prima facie* case the State has exercised the peremptory challenge based on race. *Davis*, 231 Ill. 2d at 360. This burden is not high, and is satisfied by showing the circuit court something which permits the court to infer that discrimination has occurred. *Id.* Next, if defendant has made the *prima facie* showing, the State must articulate a race-neutral reason for the use of the peremptory challenge. *Id.* at 362-63. Such a basis is something other than the juror's race. *Id.* at 363. Finally, the circuit court "must determine whether the defendant has shown purposeful discrimination in light of the parties' submissions." *Id.*

¶ 61        The last step often involves the circuit court's evaluation of the prosecutor's credibility, as well as the demeanor of the prospective juror. *Id.* The best evidence of improper

intent is often the prosecutor who made the challenge. *Id.* Because of such considerations, "the trial court's firsthand observations [are] of crucial importance." *Id.* at 363-64.

¶ 62        Defendant articulated the first time he challenged the State's use of a peremptory challenge that the challenge was unlawful simply because the challenged juror was African-American. The State responded the juror voiced a "neutral" opinion of law enforcement, and pointed out the State had already exercised a peremptory challenge as to a white male who answered "neutral" and would have as to another but for her having been excused for cause. The circuit court accepted the State's reason as credible and excused the African-American prospective juror.

¶ 63        As for the second time defendant objected to the State's challenge, he noted the prospective juror was African-American and the case was about an African-American defendant stabbing a Caucasian. Defendant further urged his defense was self-defense. The State argued it had been consistently excusing those prospective jurors who had a "neutral" opinion, and that there was another white male who the State intended to challenge for the same reason when the process got to him. Further, the State urged it was no secret they sought jurors who had positive opinions of law enforcement, and that the State asks the question about the prospective jurors' opinions of law enforcement in every case.

¶ 64        The circuit court and the parties agreed every juror on the first panel who had said their opinion of law enforcement was neutral had been excused. The court queried the State about its perceived connection of the neutral answer to the evidence expected, and the defendant about why he thought the reason was not race-neutral. Ultimately, the court noted the State had exercised peremptory challenges as to each prospective juror that had a "neutral" opinion of law enforcement, and that the court found the State's explanations credible.

¶ 65 Defendant argues that people of color are "disproportionately subjected to police interference" and thus they will more likely possess a neutral view of law enforcement. For this reason, defendant claims the State's reliance on a prospective juror's answer of "neutral" to most often an open-ended question asking about the juror's opinion of law enforcement, is a pretext for unlawful discrimination. Defendant further argues the State's general question soliciting an opinion of law enforcement is not race-neutral. We cannot make this leap from one to the other.

¶ 66 Defendant also discusses decisions from New York, Florida, and Nevada, but none are persuasive. Two of these involved questions about whether the prospective jurors believed law enforcement engaged in racial profiling or targeted people of color. The third matter discussed questions seeking jurors' opinions about the Black Lives Matter movement. Each of these lines of inquiry focused on race. The query and challenges the circuit court approved did not.

¶ 67 The State simply attempted to remove those prospective jurors who it perceived were prejudiced against the State or might have difficulty enforcing the law. The State did so by asking a broad question, and seeking to excuse those who had a "neutral" opinion of law enforcement. The circuit court engaged in a colloquy with both parties, and explored their reasons for their respective positions. Ultimately, the court determined the State's reason was credible and not a pretext for purposeful discrimination. The court was in the best position to evaluate the credibility of the prosecutor, and we will not disturb the court's decisions. The court's rulings on the State's use of its peremptory challenges were not clearly erroneous.

¶ 68                                    D. The Equal Protection Argument

¶ 69 Defendant urges we should find the removal of the African-American prospective jurors based on their "neutral" opinions of law enforcement violative of defendant's right to equal protection. Defendant's brief is full of general propositions supporting his argument, but devoid

of any in-depth discussion or substantive authority. Defendant relies on laws of the States of California and Washington, and some sociological studies.

¶ 70    Defendant did not raise this issue at trial during any of the colloquy with the circuit court or in his posttrial motion, which is generally required to preserve error for review. *People v. Chapman*, 194 Ill. 2d 186, 225 (2000). Failing to so raise such an error is a procedural default, but some errors can be reviewed if we determine plain error has occurred. *Id.* at 226. The plain error doctrine "allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances." *People v. Herron*, 215 Ill. 2d 167, 178 (2005). In short, the "doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Id.* at 186-87. Though the doctrine is "nonconstitutional," it "has roots in the same soil as due process." *Id.* at 177. "Fairness, in short, is the foundation of our plain-error jurisprudence." *Id.* Its "purpose is to protect the rights of the defendant and the integrity and reputation of the judicial process." *Id.* Defendant asserts error under the second prong of the doctrine.

¶ 71    However, before we determine if the plain error exception to forfeiture applies, we first determine if any "clear or obvious error occurred" at all. *People v. Birge*, 2021 IL 125644, ¶ 24. If we find no clear or obvious error, there is no plain-error basis to avoid procedural default. *Id.* at ¶ 42.

¶ 72    We have already determined the circuit court's rulings excusing the two African-American prospective jurors for their "neutral" opinions of law enforcement were not error. Finding no clear or obvious error, we find no plain-error basis to permit defendant to avoid procedural default on the equal protection issue he now wishes to raise.

¶ 73                                    III. CONCLUSION

¶ 74          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 75          Affirmed.