# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2021 IL App (1st) 181266

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOEY JONES, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-18-1266 |
| Filed | June 7, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-7805; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tyler J. Cox, and Natalie Sanchez, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Walker and Justice Pierce concurred in the judgment and opinion. |

¶ 1        A jury found Joey Jones guilty of attempted murder for the shooting of Brion Payne. Jones testified that he acted in self-defense and only shot Payne because Payne threatened Jones and told him he would "get his gun." Payne testified that the shooting was unprovoked. A surveillance video admitted into evidence shows Jones shoot Payne in the back of the head from inches away and mere seconds after Payne turned around from their conversation. Jones argues that the State failed to prove him guilty beyond a reasonable doubt because the State failed to disprove that he acted out of an unreasonable belief in the need for self-defense, which would be second degree murder had Payne not survived. But, because the offense of attempted second degree murder does not exist in Illinois, Jones argues he should be acquitted. We disagree and find the evidence was sufficient for the jury to reject Jones's defense and find he had the specific intent to kill Payne when he shot him.

¶ 2        We remand, however, because Jones made a challenge to the State's use of peremptory strikes during jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986). The State used all three of its peremptory strikes against Black venire members. And, as the trial court found, the three stricken jurors were a heterogeneous group, sharing race as the sole common characteristic among them. Nevertheless, the trial court found that Jones failed to make a *prima facie* case of racial discrimination and did not require the State to provide race-neutral reasons for its peremptory strikes. The trial court's conclusion was against the manifest weight of the evidence, and we remand for stage two and, if necessary, stage three *Batson* inquiry. We retain jurisdiction to review the court's ruling on remand and to resolve any remaining issues we do not address in this appeal.

¶ 3                                      Background

¶ 4        The State charged Jones with the offenses of first degree attempted murder and aggravated battery with a firearm based on the April 1, 2014, shooting of Brion Payne. Jones elected to be tried by jury, and the trial court conducted *voir dire*. We give some detail here but will expound more later as necessary to our analysis. According to the jury cards in the record, there were 50 people in the venire. To get a full jury of 12 jurors and 2 alternates, the trial court had to question 29 venire members. The trial court questioned the jurors in groups of 14.

¶ 5        After the trial court's questioning of the first group, Jones's counsel asked the jurors additional questions. The State did not. During the first round of strikes, the trial court struck John N., Carol B., and Tiffany W. for hardship. Of these three we know only that Tiffany W. is a Black woman; we do not know the others' races. Jones's counsel used four peremptory strikes on Christopher M., April D., Robert B., and Nicholas K. We do not know the races of the individuals Jones's counsel struck. The State used one peremptory strike on Tyrone D., a Black man. He had admitted to a 21-year-old felony conviction, and the State did not have any documentation to refute his representations or suggest any additional criminal history. The parties accepted two Black jurors, Diane M. and Jacqueline B.

¶ 6        At the beginning of questions for the second panel of 14, the trial court struck Jennifer G. for recent jury service. We do not know her race. After the trial court's questioning, Jones's counsel again asked a few questions, and the State declined to do so. Jones's counsel used another peremptory strike on Kelly B. We do not know her race. The State used two more

peremptory strikes on Jessica J. and Traci M., both Black women. The parties accepted one more Black juror, Noelle D.

¶ 7 After the State used its third peremptory strike, Jones's counsel made a *Batson* motion arguing that all three of the State's peremptory strikes had been against Black venirepersons. Jones's counsel argued it was, therefore, the State's responsibility to provide race-neutral reasons for its strikes. The trial court denied the motion, finding:

> "Well the first stage of the *Batson* analysis is to determine whether or not a *prima facie* case of discrimination has been shown for gender or race. Apparently, this instance, it's race, but—and considering all the circumstances of jury selection thus far the State has not stricken two individuals that are black and they have used three challenges but considering what I have seen and heard thus far, I don't believe the defense has established a *prima facie* case of race discrimination, and I'm not going to require the State at this juncture to give race-neutral reasons."

As for alternate jurors, the trial court granted a motion for cause as to Kerry B., whose race we do not know. Jones's counsel then used a peremptory strike against Edward P., whose race is also unknown. The parties eventually agreed on two alternates.

¶ 8 Before moving on, the trial court asked Jones if he agreed with his lawyer's performance during *voir dire*. Jones said: "I don't like the fact that they are striking all the Black people." In response, the trial court made additional findings:

> "While the State used three peremptories on African Americans they did not strike all of the African Americans, there are a couple here that have been accepted by both sides. Compare the questions of the three individuals, first one, Mr. D[.] had a prior felony conviction along with he indicated several other arrests for what he termed as misdemeanor matters *** Ms. J[.] my recollection is unemployed. And *** the last one, Ms. M[.], is highly educated living in a northern suburb. So this is not an androgynous [*sic*] group, they are all different. While I'm not requiring the State to state the reasons, the court can think of several race-neutral reasons on its own."

The court then confirmed with the State that the victim and witnesses were also Black and then "affirm[ed]" its original decision to deny Jones's *Batson* challenge for failure to make a *prima facie* case of discrimination.

¶ 9 Now ready for trial, Payne and Jones's father, Lenny Myles, testified for the State. Jones testified in his own defense. All three witnesses had slightly different perspectives on the shooting.

¶ 10 *Payne's Testimony*

¶ 11 On the day of the shooting, Payne worked for Safari, a company that picked up patients who used wheelchairs and took them to their various appointments. He normally clocked into work around 8:30 a.m., picked up and dropped off a couple of patients, then took a short break. During Payne's break on April 1, he received a call from Myles, his friend and coworker. Myles told Payne to meet him at a currency exchange so Myles could give Payne some money. The two had known each other for around a decade, and he and Myles would do favors for one another by picking up shifts and switching patient pickups. Sometimes they would give each other a little money or pay for lunch as a thank you for one of these favors.

¶ 12    When Payne arrived, Myles greeted him and introduced him to his son, Jones. Payne had never met Jones before. Payne waited for Myles, while he and Jones conversed but stood about 50 feet away because Jones "just kept staring" at him, making him feel "uncomfortable." After about five minutes talking with Jones, Myles told Payne, "I['ll] be right back," and walked to the currency exchange. Since his car was still running, Payne turned to walk back and turn the engine off. He took about three steps toward his car before feeling his "legs get swept out from under" him and hit the ground face first. Payne did not see or hear what caused him to fall. He tried multiple times to stand up but could not. Dazed, numb, and barely conscious, Payne heard someone tell him to stay down on the ground and that help was on the way.

¶ 13    Police eventually arrived, and an officer told Payne, "it looks like someone tried to kill you." An ambulance arrived and took Payne to Illinois Masonic Hospital, where medical staff determined that a gunshot broke bones in his neck and jaw.

¶ 14                                    *Myles's Testimony*

¶ 15    Myles planned to meet Payne at the currency exchange the morning of April 1 to pay Payne for helping him with a pickup the previous day. Jones had also called that morning and asked Myles for money. Myles told Jones to meet him at the same currency exchange where he was meeting Payne. When Myles arrived at the currency exchange, Payne was already there and the two exchanged greetings and made small talk. About five minutes after Myles and Payne started talking, Jones arrived with his girlfriend and children, and Myles introduced Payne to Jones. Myles and Jones made small talk for about five minutes.

¶ 16    When Jones and Myles finished talking, Payne told Myles, "Well I'm going to walk to my car. It's getting time for me to do some pickups." Myles responded, "let me hurry up and get y'all this money," and turned to walk to the currency exchange to cash his check. When he was about six or seven steps away from Jones and Payne, he heard a loud "pow." Frightened, Myles ran to the storefront and hid. He saw Payne lying on the ground and Jones get in his car with a gun in his hand, but he did not directly see what happened to Payne.

¶ 17    The State also introduced surveillance video from a nearby business. Myles identified himself, Payne, and Jones in the video. One of the videos shows the interaction from a considerable distance but the three men are visible standing within an empty parking space of each other. Jones leaves the group and goes to his car. Payne turns around and makes it about five steps before Jones runs up behind him and shoots him. In the second video, Payne is alone in the frame (Jones's car is off to the left) for about 20 seconds. Myles comes into frame and he and Payne interact for about five seconds. Payne starts walking away, and Jones enters the frame with his arm outstretched. He runs up to Payne, he puts a gun within inches of the back of Payne's head, and Payne falls to the ground.

¶ 18                                    *Jones's Testimony*

¶ 19    According to Jones, he drove—with his girlfriend, his girlfriend's sister, and his two children—to the currency exchange. When Jones arrived, Myles was alone. After they exchanged pleasantries, Payne joined the group, and Myles introduced him. Jones had never met Payne and had no "beef" or problem with Payne before this incident. While Myles and Jones talked, Jones noticed Payne stared at him "kind of crazy, like aggressive." Jones claimed that every time he looked at Payne, he was "aggressively staring" at him "real hard," making Jones feel "awkward" and "uncomfortable." In Jones's experience, a stranger, like Payne,

staring at you could lead to problems. Payne's behavior made Jones afraid due to his personal knowledge of several shootings in the area.

¶ 20 After five minutes, Myles told Jones that he was going to the currency exchange. After Myles left, Payne looked at him and said, "What the f*** you staring at?" Payne's statement "shocked" Jones, as he did not know Payne "from a can of paint." After Jones did not respond, Payne said, "F*** it, I'm gonna go get my gun," and began to walk to his car. Jones instantly "got scared" and "started panicking," fearing for his kids in the car. Jones did not see Payne with a gun, but believed Payne was about to retrieve a gun. Jones then went to his car and got his gun from under the driver's seat. Jones shot Payne once in the back of the head, not intending to kill him, but admitting that he "really wanted to hit [Payne] so he wouldn't come back and hit [Jones]."

¶ 21 The jury found Jones guilty, and the trial court sentenced him to 45 years in the Illinois Department of Corrections—20 years for attempted first degree murder plus a mandatory firearm enhancement. Jones timely appealed.

¶ 22                                                    Analysis

¶ 23 Relevant here, Jones argues that the State failed to prove him guilty beyond a reasonable doubt where he shot Payne out of an unreasonable belief in the need to defend himself, his girlfriend, and his children. He also argues that the trial court either (i) erred by collapsing the first two stages of the *Batson* inquiry or (ii) erred in finding he failed to make a *prima facie* showing of purposeful discrimination. Though we find the evidence sufficient to convict him of attempted first degree murder, we agree that the determination that Jones failed to make a *prima facie* case of discrimination at *Batson* step one was against the manifest weight of the evidence.

¶ 24                                              Batson *Challenge*

¶ 25 During jury selection, Jones made a challenge under *Batson*, 476 U.S. 79, arguing that the State had exercised its peremptory challenges in a biased manner, using them exclusively against Black venire members. The court initially denied the challenge, finding Jones failed to make a *prima facie* showing of race discrimination. Later, the court made an "additional record" and emphasized it would not require the State to provide race-neutral reasons for its peremptory strikes, though the court could "think of several race-neutral reasons on its own."

¶ 26 Jones challenges the trial court's procedure as a "collapse" of the three distinct phases of a *Batson* challenge or, alternatively, argues that the court erred in finding he failed to make a *prima facie* showing of race discrimination. While we disagree that the trial court's errant comment about race-neutral reasons for the State's peremptory strikes rises to the level of collapsing *Batson* steps one and two, we agree that Jones made a sufficient showing to justify advancing his *Batson* challenge to the second stage.

¶ 27 The United States Supreme Court has been unwavering in its insistence that race is unrelated to a juror's qualifications to sit on a jury. *Id.* at 87; see also *Flowers v. Mississippi*, 588 U.S. ___, ___, 139 S. Ct. 2228, 2243 (2019) ("[S]ince *Batson*, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding."). The State's use of peremptory strikes is subject to the equal protection clause (U.S. Const., amend.

XIV), and striking a juror based on race violates the defendant's right to equal protection and diminishes his or her right to a trial by jury. *Batson*, 476 U.S. at 86.

¶ 28    Challenges under *Batson* proceed in three distinct steps. *People v. Davis*, 231 Ill. 2d 349, 360 (2008). First, the defendant must make a *prima facie* showing that the State struck jurors based on race. *Id.* Second, the State may offer race-neutral reasons for the challenged strike. *Id.* at 362-63. Third, and finally, the defendant may rebut the State's race-neutral reasons as pretextual. The trial court then evaluates the facts and arguments to determine if the State engaged in purposeful race discrimination. *Id.* at 363.

¶ 29    Jones correctly argues that the trial court can commit error when "it is unclear whether the trial court found defendant established a *prima facie* case" and "it appears the proceedings drifted into the second stage of the *Batson* analysis." *People v. Shaw*, 2014 IL App (4th) 121157, ¶ 26. The State argues that Jones forfeited his challenge to the trial court's *Batson* procedures because he did not object to how the trial court conducted its inquiry. We agree that Jones did not object and did not include that specific claim of error in his motion for a new trial.

¶ 30    The State goes further and argues that Jones cannot argue for plain error review because he did not mention plain error in his opening brief. We admonish the State, yet again, that this argument is inappropriate. *E.g.*, *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 77 (describing this argument as "patently frivolous" and collecting cases).

¶ 31    In any event, the first step of the plain error analysis depends on whether clear and obvious error occurred. *People v. Williams*, 193 Ill. 2d 306, 349 (2000). We perceive no error because the trial court's *Batson* ruling was not "unclear." The court twice stated it denied Jones's *Batson* challenge because he failed to make a *prima facie* case. We acknowledge the trial court's comment about its ability to imagine race-neutral reasons for the State's peremptory strikes. Unless the trial court is willing to advance the *Batson* inquiry, comments like these should remain unspoken. See *Shaw*, 2014 IL App (4th) 121157, ¶ 32 (recommending step-by-step, methodical approach). But after the court mentioned race-neutral reasons in passing, it clarified: "I reaffirm my original decision that I do not find a *prima facie* case has been made and the court will not move this along to the second stage of the *Batson* analysis." This ruling is sufficiently clear for us to conclude that the trial court did not collapse the first two stages of *Batson*.

¶ 32    Though we disagree that the trial court collapsed steps one and two of the *Batson* procedure, we agree with Jones that he established a *prima facie* case of discrimination sufficient to advance the inquiry to stage two. The burden on Jones to make out a *prima facie* case of racial discrimination in the State's use of peremptory challenges was "not high." *Davis*, 231 Ill. 2d at 360.

¶ 33    In evaluating a defendant's *prima facie* case, courts look to these seven factors: (i) racial identity between the defendant and excluded potential jurors, (ii) a pattern of strikes against potential jurors of the alleged racial group, (iii) a disproportionate use of peremptory strikes against members of the alleged racial group, (iv) the level of representation of the alleged racial group in the venire versus their representation in the jury, (v) the prosecutor's questions and statements during *voir dire* and while exercising their peremptory strikes, (vi) a determination of whether the stricken jurors were a heterogenous group sharing race as their only common characteristic, and (vii) the race of the defendant, witnesses, and victim. *People v. Williams*,

173 Ill. 2d 48, 71 (1996). We will not overturn a trial court's conclusion at the first stage of *Batson* unless it is against the manifest weight of the evidence. *Id.*

¶ 34 The State argues that we should deny Jones's *Batson* claim outright because he failed to make a complete record and relies only on the number of Black jurors the State excluded from the jury. We agree with the State that the arguments before the trial court could have been more detailed, but the primary concern in *People v. Allen*, 401 Ill. App. 3d 840 (2010), on which the State relies, turns on the sufficiency of the record for our review. See *id.* at 849 (pointing to lack of "any specific facts" supporting an inference of discrimination). Indeed, it seems that sufficiency of the record, not formalist considerations of the scope of a defendant's argument, is the primary concern at the *prima facie* stage. See *People v. Wiley*, 156 Ill. 2d 464, 473 (1993) (noting, even where questions of waiver are concerned, an appellate court can review *Batson* challenge where the "trial court's proceedings reveal[ ] sufficient information regarding the racial composition of the prospective jurors who were selected or excused in order to permit our consideration of the defendant's claims").

¶ 35 Viewing the record made during the arguments on Jones's *Batson* motion, we find sufficient information to evaluate his challenge to the jury's composition. To the extent record deficiencies exist as to certain factors, we will construe them against Jones. See *Davis*, 231 Ill. 2d at 365.

### *Racial Identity*

¶ 37 That the defendant and the excluded potential juror share the same race constitutes a relevant (though not dipositive) factor in finding a *prima facie* case of racial discrimination. *Williams*, 173 Ill. 2d at 71-72. The trial court found that Jones is Black and that all three venirepersons the State struck using peremptory challenges were Black. This factor weighs in Jones's favor.

### *Pattern of Strikes*

¶ 39 The State used three peremptory challenges, all of them against Blacks. We have found no pattern of strikes when the State used one of two peremptories against members of a certain race or one of eight peremptories against members of a certain race. *Id.* at 72 (one of two (citing *People v. Peeples*, 155 Ill. 2d 422, 470 (1993) (one of eight))). Here, we have more of a pattern than both *Williams* and *Peeples*. We recognize that the presence of three Black jurors can weaken the *prima facie* case of discrimination. See *People v. Rivera*, 227 Ill. 2d 1, 13-14 (2007). Nevertheless, complete exclusion of the relevant racial group from the jury is not required to show discrimination. *People v. Johnson*, 199 Ill. App. 3d 798, 804 (1990). We find the presence of three Black jurors does not soften the State's use of 100% of its peremptory challenges on Black venirepersons. This factor also weighs in Jones's favor.

### *Disproportionate Strikes*

¶ 41 For similar reasons, we find the proportionality of strikes weighs in Jones's favor. In *Williams*, for example, the court found no disproportionate strikes against Blacks where the State used one peremptory against a Black venireperson and one against a white venireperson. *Williams*, 173 Ill. 2d at 73. The proportion (50/50) was exactly equal. Again, the State used

100% of its peremptory strikes against Black venirepersons, a disproportion.

*Representation in the Venire*

¶ 43    The factor of venire representation involves, where possible, comparing the proportion of accepted jurors who are members of the relevant racial group to the proportion of the venire who are members of the relevant racial group. *Id.* Where evidence of representation in the venire is insufficient, we treat the factor neutrally. *Id.* Here, we have only partial evidence about the racial makeup of the venire versus the racial makeup of the empaneled jury. The record shows that three Black jurors made it onto the panel. There were 12 total jurors and 2 alternates. So, the percentage of Black jurors (including alternates) is 3 out of 14, or 21%.

¶ 44    The State argues there is "no record" of the number of Black venirepersons, but that is not quite right. We know the trial court empaneled three Black jurors and that the State used peremptory strikes on three others. We also know that one Black venire member was stricken after an agreed motion for cause. The juror cards show a venire of 50 members, and the record of *voir dire* shows the court questioned 29 of them. Problems arise, however, because we do not know the races of the 21 venirepersons the court did not question. We do not even know the races of all 29 venirepersons the court *did* question. Jones made his *Batson* challenge after the twenty-third potential juror, so no record was made of the races of potential jurors 24 through 29. Also, as we discussed in our summary of the facts, we do not know the races of the venirepersons against whom Jones used peremptory strikes. We lack enough information about the racial composition of the venire relative to the jury to adequately analyze this factor. We conclude that this factor is neutral.

*Prosecutor's Statements and Questions*

¶ 46    The State did not ask any questions of the potential jurors. When striking potential juror Tyrone D., the State only commented that it did not have a record of the criminal conviction to which he had admitted. When excusing Jessica J., the State said, "we would use a peremptory on her." The State used similar language when striking Traci M. When discussing Jones's *Batson* motion, the State did no more than mention the race of the empaneled Black jurors and responded affirmatively to the trial court's question about the race of the victim and witnesses. See *id.* (statements that are "merely descriptive" not evidence of *prima facie* race discrimination in jury selection). We find this factor weighs against a finding of discrimination.

*Heterogenous Group*

¶ 48    Evidence tending to show a *prima facie* case of discrimination includes showing the excluded venirepersons are a "heterogeneous group sharing race as their only common characteristic." *Id.* at 74. Another possible, though not necessary, mode of comparison includes "whether the excluded [Black] venirepersons share any characteristic with the non-[Black] jurors." *Id.* We are troubled by this factor because it appears the trial court got the law backward.

¶ 49    In denying Jones's challenge, the trial court described some of the excluded jurors' characteristics and explained: "So this is not an androgynus [*sic*] group, they are all different." Typo or misspeak aside, the trial court found that all the stricken jurors were "different" and then concluded there was no *prima facie* showing of discrimination; but differences between

the stricken jurors unrelated to their race is evidence of discrimination, not a lack of discrimination.

¶ 50 We agree with the trial court that all the stricken jurors are different. Tyrone D. lives with his family and works as a welder. He is not married and has three children who do not live with him. He is not active in his community and plays drums in his free time. He admitted having a felony conviction for a drug offense from 21 years ago and "maybe three" other arrests for misdemeanor offenses. The State had no records to corroborate or disprove his admissions. He assured the court that nothing about his previous experience with the justice system would affect his ability to be fair.

¶ 51 Jessica J. lived with her mom and is "in a program" to learn how to be a hairdresser. She has a partial college education. She has one child and is not active in her community. She had served on a jury before and had been a witness in another case. She has never been arrested, and the State had no records to corroborate or refute that assertion. Though her brother was killed more than 13 years ago, she assured the court that nothing about her life experiences would prevent her from being fair.

¶ 52 Traci M. owns her own home and has been a teacher for 21 years. She has a bachelor's and master's degrees. She admitted to a misdemeanor conviction for forging a check about 28 years ago but did not know anyone who had been a victim of a crime. She was acquainted with lawyers and police officers from working in her community and assured the court that nothing about those relationships or life experiences would impact her ability to be fair.

¶ 53 The group of jurors the State struck consisted of an unemployed woman in a cosmetology program, a welder, and a teacher of 21 years. Only two of the stricken jurors have children. Only two of the stricken jurors live with family. Only two of the stricken jurors have criminal records. Only one of the stricken jurors knows a crime victim. Only two jurors know police officers, and only one knows lawyers. All three have nothing in common except their race. We find the trial court misapplied this factor, and it weighs in favor of finding a *prima facie* case of discrimination.

¶ 54 Though not required, several empaneled jurors share characteristics with the stricken jurors. For example, several empaneled jurors were victims of crime. Carol K. had a "couple cars stolen." Edward L.'s home was robbed. Noelle D. walked in on her home being robbed and had a friend who was robbed as well. Christine D. had a car stolen from her driveway, and her father was robbed at gunpoint.

¶ 55 At least one empaneled juror, Ramiro R., had been arrested for a misdemeanor (graffiti, he explained). The State confirmed the arrest and explained it never led to a conviction.

¶ 56 Several empaneled jurors knew police officers, including Michelle R., Carmen S., Jacqueline B. (a Cook County Sheriff's officer married to a Cook County correctional officer), Brigitte L., Noelle D. (family members), Christine D. (nephew), Ramiro R., and Regina R. Several others knew lawyers. A few had pervious jury service. The empaneled jurors all have similar life experiences to at least one of the stricken jurors (unmarried with children, various levels of education, various property rental or ownership situations). Like the insular comparison between stricken jurors, the comparison between stricken jurors and empaneled jurors weighs in favor of finding a *prima facie* case of discrimination.

When crimes are "interracial in nature," the inference of purposeful discrimination in jury selection is higher. *People v. Andrews*, 146 Ill. 2d 413, 433 (1992). Here, the trial court made a record that Jones is Black and that the victim and all the witnesses are too. We find this factor weighs against finding a *prima facie* case of discrimination.

Prima Facie *Case of Purposeful Racial Discrimination*

On balance, Jones has made a *prima facie* case of purposeful racial discrimination in jury selection. Of particular significance, the trial court misapplied the concept of heterogeneity among stricken jurors, getting the analysis backward. We emphasize that we do not know if the State engaged in purposeful discrimination, and we do not impute a racial motive on the State's pattern of strikes at this stage. We hold that Jones has established a *prima facie* case and the trial court should have at least asked the State to come forward with race-neutral reasons for its peremptory strikes and evaluated them. We remand for the court to proceed to *Batson* step two.

A *Batson* inquiry involves a rigorous exercise; it is incumbent that the trial court make a record. *Shaw*, 2014 IL App (4th) 121157, ¶ 35. We express no opinion on the ultimate merits of Jones's *Batson* claim and leave the trial court to make its own conclusion at step two and, if appropriate, step three. We retain jurisdiction to review the trial court's findings after remand. The parties will be free to file supplemental briefs addressing any issues arising from the *Batson* hearing on remand. *Id.* ¶ 36.

*Reasonable Doubt*

Ordinarily, we would only address the other issues in a defendant's appeal after the trial court's new *Batson* ruling. *Id.* But Jones also challenges his conviction on reasonable doubt grounds, arguing the State did not present sufficient evidence to refute his self-defense claim. In the interest of judicial economy, we address Jones's reasonable doubt argument now. No matter the outcome of his *Batson* challenge on remand, if the trial court rejects Jones's *Batson* claim and he returns to this court or if the trial court finds discrimination in jury selection and orders a new trial, we will have to determine whether the State proved him guilty beyond a reasonable doubt in this trial.

Jones argues that the State failed to prove beyond reasonable doubt that he had the specific intent to kill Payne sufficient to support a conviction for attempted first degree murder. Jones acknowledges the jury rejected his self-defense claims based on a reasonable belief in the need for self-defense but argues the evidence supports a claim for an unreasonable belief in the need for self-defense. According to Jones, his unreasonable belief in the need for self-defense renders his conviction legally impossible because the hypothetical mitigated offense— attempted second degree murder—does not exist in Illinois. The State responds that the jury found Jones intended to kill Payne and rejected Jones's attempts to explain his actions outright. We agree with the State. The evidence allowed a rational factfinder, here the jury, to reject Jones's version of events in its entirety and find he intended to kill Payne when he shot him.

When a defendant challenges the sufficiency of the State's evidence, we ask whether, viewing the evidence in a light most favorable to the State, any rational finder of fact could have found the defendant guilty beyond a reasonable doubt. *E.g.*, *People v. Gannon*, 213 Ill.

App. 3d 560, 565 (1991). This standard applies to both the jury's acceptance of the State's evidence of guilt and the jury's rejection of an affirmative defense. *Id.* at 565-66. Where sufficient evidence exists supporting the jury's rejection of an affirmative defense, we are "constrained to affirm the conviction." *Id.* at 566 (citing *People v. Tipton*, 78 Ill. 2d 477, 487-88 (1980)).

¶ 66    Jones primarily argues that, even if the State disproved his reasonable belief in the need for self-defense, it did not disprove his unreasonable belief in the need for self-defense. For completed murders (non-attempts), an unreasonable belief in the need for self-defense mitigates first degree murder to second degree murder but does not result in an outright acquittal. See 720 ILCS 5/9-2(a)(2) (West 2018). Attempt offenses require the State to prove the same mental state as the underlying offense. *Id.* § 8-4(a); *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 42 (citing *People v. Lopez*, 211 Ill. 2d 441, 448-49 (1995)). But one cannot intend to kill without lawful justification (the mental state for first degree murder) and simultaneously intend to create the mitigating circumstance of unreasonable belief in the need for self-defense (the mental state for second degree murder). *Guyton*, 2014 IL App (1st) 110450, ¶ 42. So, " 'the offense of attempted second degree murder does not exist in this State.' " *Id.* (quoting *People v. Lopez*, 166 Ill. 2d 441, 449 (1995)). Jones argues, therefore, that proof of his unreasonable belief in the need for self-defense should lead, not to conviction on a mitigated offense, but an outright acquittal because he could not have developed the specific intent to kill Payne.

¶ 67    The State responds, relying on *Guyton*, that the General Assembly has decided not to provide any mitigating circumstances for attempted first degree murder—even where the defendant argues he acted out of an unreasonable belief in the need for self-defense. *Id.* ¶ 46. The court in *Guyton* described this situation as a "conundrum," and we agree. But we need not resolve this particular problem because, as the State also argues, the evidence was sufficient for the jury to reject Jones's claim that he needed to defend himself whether his belief in that need was reasonable or not.

¶ 68    Jones, relying exclusively on his own trial testimony, argues there was evidence that Payne had acted aggressively toward him and was going to his car to get his gun when Jones decided to retrieve his own gun and shoot Payne in a "panic." But the video of the shooting reveals material inconsistencies in Jones's testimony—inconsistencies that directly relate to his belief in the need for self-defense and his intent to kill. Jones testified that after Myles walked away, there was enough time for him to converse with Payne and for Payne to threaten, "Well f*** it, I'm gonna go get my gun." After this conversation, according to Jones, Payne walked to his car to get his gun. According to Jones, it was not until then that he, fearing for his and his children's lives, went to his car, got his gun, and shot Payne.

¶ 69    The video, however, shows Jones, Myles, and Payne standing together. Payne takes a few steps back away from the group. Myles steps towards Payne and speaks with Payne briefly while Jones opens his car door, leans in, and reaches inside. Remember, Jones had testified that Payne had started walking to his car before Jones went to get his gun.

¶ 70    We then see Jones holding something as he leans away from the car, and Payne starts walking away. Jones immediately runs up behind Payne, shoots him in the back of the head, and flees the scene. Payne and Jones were never alone, as Jones claims. Three seconds passed between the end of Payne's and Myles's conversation and Jones shooting Payne, during which time Jones had already gone to his car to retrieve his gun.

- 11 -

¶ 71    Jones also testified that he "was not aiming his gun in a certain direction," and he "really just wanted to hit him so he wouldn't come back and hit me." But the video shows Jones walking up right behind Payne with his gun drawn. Jones puts the gun inches away from back of Payne's head, braces himself to aim, and then takes the shot. We have found evidence of intent to kill not even "close factually" where a defendant fired a gun at a victim from a distance of 12 to 15 feet. *People v. Mosley*, 85 Ill. App. 3d 870, 875 (1980). Here, as we said, Jones was mere inches from Payne. More broadly still, we have held that "[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." (Internal quotation marks omitted.) *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Not only did Jones fire in Payne's general direction, but he also aimed at his head from inches away. See *id.* (the act of shooting in a manner "the direct and natural tendency of which is to destroy another's life" evidence of intent to kill (internal quotation marks omitted)).

¶ 72    We acknowledge (though Jones does not argue) some minor inconsistencies in Myles's and Payne's testimony. We do not find their inconsistencies material to the question of intent. More importantly, our standard of review is highly deferential to the jury. We ask whether the evidence was sufficient that a rational jury could have disbelieved Jones's testimony that he did not intend to kill. The evidence, particularly the video, passes that standard.

¶ 73    Affirmed in part and reversed in part.

¶ 74    Cause remanded.