2025 IL App (1st) 232013-U

No. 1-23-2013

Order filed May 19, 2025

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 21 CR 2229 |
| STEVEN NGUEREBANDA, | ) ) | Honorable Aleksandra Gillespie, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in rejecting defendant's defense of necessity where the evidence showed that defendant escalated the situation and reasonable alternatives to pushing the victim were available. Remanded with instructions where defendant was convicted of two counts of aggravated battery in violation of the one-act, one-crime rule.

¶ 2    Following a bench trial, defendant Steven Nguerebanda was found guilty of two counts of

aggravated battery and sentenced to 13 months of probation and anger management classes.

Defendant appeals, arguing that the trial court erred when it rejected his affirmative defense of

necessity. He further argues, and the State concedes, that his convictions violate the one-act, one-crime rule. We affirm and remand with directions.

¶ 3    Defendant was charged with two counts of aggravated battery for pushing Hailey Murrieta, causing great bodily harm (count I) and permanent disfigurement (count II) (720 ILCS 5/12-3.05(a)(1) (West 2020)).

¶ 4    Prior to trial, defendant disclosed that he intended to present the affirmative defense of necessity.

¶ 5    At trial, Murrieta testified that on June 13, 2020, she visited her friend Rachel Miller, who lived in an apartment on the 900 block of West Carmen Avenue in Chicago. Around midnight, Murrieta heard arguing in the lobby. Murrieta went to the lobby, where she observed a man, later determined to be defendant, and a woman, later determined to be Amanda, sitting on a bench in the corner.[1] Defendant became "more aggressive" with his conduct and body language. Murrieta told defendant to step away from Amanda, who appeared "scared." Defendant moved to another bench, about a foot away, but then stood and pointed "very close" in Murrieta's face. They exchanged words, but Murrieta could not recall what they said.

¶ 6    Amanda got behind Murrieta, and Miller, who had entered the lobby, intervened to help Murrieta and Amanda keep their distance from defendant. Defendant shoved Miller, Murrieta, and Amanda, and grabbed Amanda as Murrieta tried to help her exit the building. He blocked the exit as Miller held the door open, shoved Miller several times, and screamed at all three women. Defendant was "very aggressive" with his tone and body language.

_____

[1] Amanda's last name does not appear in the record. During cross-examination of Murrieta, defense counsel stipulated to the identity of defendant as the man in the lobby.

¶ 7       At some point, defendant lunged towards Murrieta, placed his hands on her collarbone, and pushed her using "real hard force," causing her to fall backwards and land on her hands. Murrieta felt instant pain in her left wrist, which swelled and felt hot to the touch. She returned to Amanda, who was sitting on the bench and trying to contact her sister. Murrieta spoke to the sister, informing her that Amanda was safe and they were trying to get her out of the building.

¶ 8       Shortly after Murrieta's fall, two male tenants arrived in the lobby. After one of the men talked to defendant, the man, defendant, and Miller escorted Amanda into her sister's vehicle. Defendant returned about a minute later, and he was "still very aggressive" with his tone and yelling before entering the elevator.

¶ 9       On June 30, 2020, Murrieta had surgery in which nine screws and a plate were placed on her left wrist. Murrieta showed the court the three-inch surgical scar.

¶ 10      The State published a video from the building lobby, which was entered into evidence. The video is included in the record, and we have viewed it. There is no audio component. Murrieta identified the parties in the video during her testimony.

¶ 11      In the video, Murrieta enters the lobby and speaks to someone outside the frame. After about 30 seconds, defendant approaches Murrieta, pointing in her face. The two seem to be arguing, and defendant becomes more agitated. Miller enters the lobby, and defendant grabs her arm and pushes her into Murrieta. Amanda appears and stands behind defendant. Miller then holds the lobby door open, gesturing to Amanda to go outside. Defendant blocks Amanda with his arm and grabs her wrist, moving her behind him. He releases Amanada, and she moves toward Murrieta. As Amanda passes defendant, he grabs her arm and Murrieta tries to pry his hand off Amanda. While this happens, defendant and Murrieta continue to argue, and defendant points in

Murrieta's face. Miller places herself between Murrieta and defendant. She also tries to pry defendant's hand off Amanda's arm. Murrieta says something to defendant, and he shoves all three women but continues to hold Amanda's arm.

¶ 12    After about a minute, defendant lunges at Murrieta, who stumbles but remains standing. Murrieta walks toward defendant, who gestures at her and points in her face. Miller opens the lobby door and gestures to Amanda to exit, but defendant stops Amanda from leaving. He turns to Murrieta, points at her face, and appears to speak angrily at her. Murrieta raises her hands, palms facing forward. Defendant lunges at her, pushing on her shoulders. Murrieta falls backwards, and her left hand hits the floor.

¶ 13    On cross-examination, Murrieta affirmed that she initiated contact with defendant and Amanda. Murrieta wanted to get Amanda out of the building "to be safe" based on the language Murrieta heard. She believed Amanda was in distress. Defendant allowed Amanda to leave when her sister's vehicle was outside.

¶ 14    Miller testified that defendant was arguing with Amanda about leaving the building. Amanda said that defendant would not let her leave, and she called her sister to pick her up. Defendant said that Amanda was "drunk and crazy" and "couldn't leave." When Murrieta approached, defendant said it was none of their business and repeated that Amanda was "drunk and crazy." From Miller's observation, Amanda did not appear intoxicated.

¶ 15    Miller recounted that defendant shoved her twice, grabbed Amanda's arm with a "very strong grip," and shoved Murrieta. As Miller attempted to help Amanda exit the building, defendant placed his hands on Murrieta's shoulders and pushed, causing Murrieta to fall backwards onto the floor, where she caught herself with her hands. Defendant then turned to the

door and tried to prevent Amanda from leaving. Eventually, a male neighbor entered the lobby and helped Amanda exit the building, along with defendant and Miller. When defendant, Miller, and the male neighbor returned to the building, defendant began yelling "aggressively."

¶ 16   On cross-examination, Miller confirmed that defendant repeated that Amanda was drunk, Amanda should not leave, and it was none of their business. She agreed that defendant became aggressive when they wanted Amanda to leave the premises.

¶ 17   Defendant testified that on the day of the incident, his friend's girlfriend, Amanda, drove him home from a soccer game. Her driving was "no good" because she was "very drunk." When they arrived at his apartment, he asked for her vehicle's keys because he did not want her to drive. After Amanda gave him the keys, he briefly went to his apartment while Amanda waited for him in the lobby. When defendant retuned to the lobby, he asked Amanda to call someone to pick her up. They contacted Amanda's sister, and defendant asked her if she could pick up Amanda "because she is very drunk." The sister said she would be there in 40 to 50 minutes.

¶ 18   In the lobby, Amanda was talking and "yelling too much" that she needed her key back. Defendant returned the key, but told her she could not leave and needed to wait for her sister. After about 40 minutes, a woman entered the lobby and talked to them. When the woman grabbed defendant's hand to push him away, he pushed her. The woman made physical contact with him first. Defendant told her that he could not let Amanda leave because Amanda was drunk and it was not the woman's business.

¶ 19   On cross-examination, defendant testified that he asked Amanda for her keys as soon as they arrived in his lobby, and she complied. Defendant then told her to call someone to pick her up. Amanda was "yelling a lot," but he was not yelling.

¶ 20    Defendant pointed at the two women, but one of the women "started first" with how she talked to him. The woman did not ask him what happened and just told him that he wanted to rob and kidnap Amanda, which made him "mad." Defendant tried to explain that Amanda was drunk, but the woman refused to listen. He spent nearly 15 minutes trying to explain the situation before he pushed the woman. Defendant only pushed the woman because he did not want Amanda to go with her, but to remain in the lobby until Amanda's sister picked her up.

¶ 21    The court found defendant guilty on both counts of aggravated battery. The court found the facts uncontroverted that defendant pushed Murietta, causing her to fall and break her wrist. The court noted that, in his necessity defense, defendant alleged that he had to push Murrieta to prevent Amanda from driving drunk. The court concluded, however, that "there was another alternative that existed other than pushing Ms. Murrieta." The court remarked that "[c]learer minds should have prevailed in this situation and calmer minds would have provided a much more alternative [*sic*] than the actual pushing of the victim in his case."

¶ 22    Defendant filed a motion for new trial, which the court denied. At the hearing, the court explained that the video "clearly depicts [defendant] pushing [Murietta]" and the "necessity defense *** clearly didn't shift the burden back to the State in any way, shape, or form." The court found that the "fact remains that [defendant] actually escalated the situation."

¶ 23    Defendant was sentenced to 13 months of probation and anger management classes.

¶ 24    On appeal, defendant first argues that the trial court erred in rejecting his defense of necessity.

¶ 25    "When reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. "The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *People v. Swenson*, 2020 IL 124688, ¶ 36. We review the evidence "in the light most favorable to the prosecution," and "[a]ll reasonable inferences are drawn in favor of a finding of guilt." *Id*. ¶ 35. This standard applies to the factfinder's "acceptance of the State's evidence of guilt" and the "rejection of an affirmative defense." *People v. Jones*, 2021 IL App (1st) 181266, ¶ 65. Where sufficient evidence supports the factfinder's rejection of an affirmative defense, we are " 'constrained to affirm the conviction.' " *Id.* (quoting *People v. Gannon*, 213 Ill. App. 3d 560, 566 (1991)).

¶ 26    A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he knowingly causes great bodily harm, permanent disability, or disfigurement. 720 ILCS 5/12-3.05(a)(1) (West 2020). In this case, defendant does not contest that he pushed Murrieta but asserts he did so out of necessity.

¶ 27    Under the defense of necessity, conduct that otherwise would "be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2020). The person claiming the defense must show some evidence that he (1) was without blame in occasioning or developing the situation, and (2) reasonably believed that his conduct was necessary to avoid a greater injury than that which would arise from his conduct. *People v. Guja*, 2016 IL App (1st) 140046, ¶ 47.

¶ 28 "Necessity involves a choice between two admitted evils where other optional courses of action are unavailable." *People v. Kratovil*, 351 Ill. App. 3d 1023, 1034 (2004). The defense applies "only if the conduct was the sole reasonable alternative available to the defendant under the circumstances." *Id.* The threshold to establish the affirmative defense of necessity is low, but requires the defendant to present some evidence to raise a reasonable doubt as to his guilt. *Guja*, 2016 IL App (1st) 140046, ¶ 46. Once the defense has been raised, the burden shifts to the State to prove beyond a reasonable doubt that the defendant did not act out of necessity. *People v. Azizarab*, 317 Ill. App. 3d 995, 999 (2000). "We will not disturb the trial court's determination absent a showing no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id*.

¶ 29 In the present case, the trial court determined that defendant did not present evidence to raise the affirmative defense of necessity such that the burden did not shift to the State to disprove that defense. This was not error.

¶ 30 As to the first prong, the record does not show that defendant was without blame in developing the situation. Defendant argued with Amanda loud enough to be heard from inside Miller's apartment, causing Murrieta and Miller to investigate. Defendant repeatedly yelled at Murrieta and Miller, pointed in Murrieta's face, and shoved the women. He also grabbed Amanda and refused to let go as Murrieta and Miller attempted to help her exit the building. Murrieta and Miller attempted to pry defendant's hand from Amanda's arm after he grabbed her again until he eventually let go. Defendant admitted he was mad because Murrieta accused him of wanting to rob and kidnap Amanda. Defendant testified that, after 15 minutes of explaining that he could not let Amanda leave the building because she was drunk, he pushed Murrieta. We find that

defendant's conduct of engaging in an argument and physical struggle with the women shows that he escalated the situation, and he therefore fails to fulfill the first prong of the necessity defense.

¶ 31    As to the second prong of the defense, defendant fails to show that his conduct was necessary to avoid a greater injury, as reasonable alternatives to pushing Murrieta were available. Defendant explained that he pushed Murrieta to prevent Amanda from leaving and driving drunk. However, it was uncontested that Amanda's sister was on her way to get Amanda. Based on her conversation with defendant, Amanda's sister was expected to arrive in 40 to 50 minutes. Defendant and Amanda had already been waiting for about 40 minutes before Murrieta entered the lobby. As a reasonable alternative to pushing Murrieta, defendant could have waited for Amanda's sister to arrive. He could have also let Amanda wait outside for her sister with Murrieta and Miller. He could have further requested Amanda to give him or the women her vehicle's key. The record demonstrates that reasonable alternatives were available to prevent Amanda from driving and defendant pushing Murrieta was not the sole reasonable action. Defendant therefore also failed to satisfy the second prong of the necessity defense. Accordingly, the trial court did not err when it found that a defense of necessity had not been established under these circumstances.

¶ 32    Nevertheless, defendant maintains that he was not to blame for occasioning or developing the situation leading to the push and no alternative course of conduct was specified by the State or the court. There is no requirement that the State present reasonable alternatives to defendant's actions where defendant had the responsibility of establishing the defense. See *Guja*, 2016 IL App (1st) 140046, ¶ 49 (to establish the defense of necessity, the defendant must show that his actions were the "sole reasonable alternative" to prevent greater harm). Moreover, the court explained posttrial that the video clearly depicted defendant pushing Murrieta, he escalated the situation, and

the burden to disprove the affirmative defense had not been shifted to the State. Defendant provides no basis to overturn the court's determination of guilt.

¶ 33 Defendant next argues, and the State concedes, that only one of his two convictions for aggravated battery should stand under the one-act, one-crime rule. Although counsel failed to preserve the error for appellate review, one-act, one-crime errors may be reviewed under the plain-error doctrine "because they implicate the integrity of the judicial process." *People v. Nunez*, 236 Ill. 2d 488, 493 (2010).

¶ 34 A defendant may only be convicted of one crime resulting from a single act under the one-act, one-crime rule. *People v. Crespo*, 203 Ill. 2d 335, 340 (2001). When a defendant is convicted of multiple offenses predicated on the same physical act, the court must vacate the conviction for the less serious offense. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). To determine which offense is more serious, we look to the plain language of the statutes and vacate the conviction with the lesser punishment. *In re Samantha V.*, 234 Ill. 2d 359, 379-80 (2009). If the convictions carry the same punishment, we look to which offense has the more culpable mental state. *Id*. We review claims of one-act, one-crime violations *de novo*. *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 35 Here, defendant was convicted of aggravated battery for pushing Murrieta and causing great bodily harm and permanent disfigurement, both brought under the same subsection of the aggravated battery statute. 720 ILCS 5/12-3.05(a)(1) (West 2020).

¶ 36 We agree that defendant's two aggravated battery charges were predicated on the same physical act. Defendant is also correct that the charges carried the same mental state of "knowingly" and the same punishment. See 720 ILCS 5/12-3.05(a)(1), (h) (West 2020). Where, as here, the two convictions carry the same mental state and punishment, this court cannot

determine which is the more serious offense, and we must remand to the trial court to make that determination. *Samantha V.*, 234 Ill. 2d at 379-80. We therefore remand to the trial court to determine the more serious offense and direct the court to vacate the less serious conviction. *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 69.

¶ 37    For the foregoing reasons, we remand with directions, and affirm the judgment in all other respects.

¶ 38    Affirmed and remanded with directions.