2022 IL App (2d) 210281
No. 2-21-0281
Opinion filed August 4, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) )  ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-714 |
| RAHSHAN D. DUFFIE, | ) ) | Honorable Robert A. Wilbrandt Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial in the circuit court of McHenry County, defendant, Rahshan D.

Duffie, was convicted of escape (730 ILCS 5/5-8A-4.1(a) (West 2020)) based on evidence that he

violated the terms of his pretrial release in the underlying prosecution, case No. 20-CF-243, by

removing an electronic monitoring device from his ankle. Defendant argues that we must reverse

his conviction because the State failed to prove that he received notice that his failure to comply

with the conditions of the electronic monitoring program could lead to an escape prosecution. We

reject that argument but accept defendant's alternative contention that, during jury selection, the

trial court failed to conduct proper proceedings under *Batson v. Kentucky*, 476 U.S. 79 (1986). We

enter a limited remand for compliance with *Batson*, consistent with *People v. Trejo*, 2021 IL App (2d) 190424-B.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was charged by indictment with a single count each of escape and criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2020)). As noted, the escape charge was based on his removing an electronic monitoring device from his ankle. The damage-to-government-supported-property charge was based on the damage caused when defendant unlawfully removed the device.

¶ 4     During jury selection, the prosecutor questioned prospective juror Travis Wilbert, a retired national bank examiner, about his former occupation. Wilbert indicated that his position entailed knowledge and application of banking laws. Asked whether he would describe himself as "more of an analytical person or common sense person," Wilbert responded, "I'm both." Wilbert elaborated:

> "[W]ithin my position, I had to use common sense as well with the laws there can be some gray areas, and working with clients, so you have to use common sense, but then also have to be analytical to identify where a violation of the law has occurred."

¶ 5     The prosecutor asked whether there were times when Wilbert "had to take all these different factors into play to determine whether a violation occurred." Wilbert responded:

> "Definitely had to take a lot of things into play. I mean ***, the violation of law was there. What was—you know, did you intentionally violate the law or was it over, you know, something you overlooked that caused the violation of law; so those type of, you know, reasoning, thought process entered into things."

¶ 6    The prosecutor exercised a peremptory challenge against Wilbert. The trial court interjected, "You need a *Batson* reason on Mr. Wilbert." The prosecutor responded that her concerns arose from Wilbert's answers to questions about the role of the law in his former occupation of bank examiner. The prosecutor explained:

"Judge, his answer to the question the law he applied in bank cases, where someone could commit a technical violation, but he said that like even if it's a technical violation, he has to look at all the surrounding circumstances and that causes me concern because we want somebody who is going to follow the law exactly as it is, not consider, you know, well, it wasn't that big of a violation.

And I think that the factors that he applied in his job are very different from what we apply here. He is familiar with the bank law and federal and state law, so that was—that was the concern that we had and the reason that we would be asking to strike him."

¶ 7    Defense counsel objected to the challenge, stating, "[T]he [S]tate doesn't like [Wilbert] because they think he will be favorable to my client and I don't think it's for good reasons. I think it's—the reasons are suspicious." Defense counsel added that Wilbert was "the only person of color in this courtroom." The trial court allowed the State's peremptory challenge, stating, "The court believes that the [S]tate has a reason that would comply with *Batson*."

¶ 8    The evidence at trial established that in March 2020 defendant was charged with theft and was released on bond but was ordered to wear an electronic monitoring device attached by a strap to his ankle. Before the device was placed on his ankle, defendant signed a document titled "McHenry County Court Services Electronic Monitoring Agreement" (Agreement). By signing, defendant agreed to wear the electronic monitoring device 24 hours a day and remain home during his 11:30 p.m. to 8 a.m. curfew. He also acknowledged that physical evidence that the device had

been tampered with or removed would constitute *prima facie* evidence that he violated the Agreement and might result in a warrant for his arrest. The Agreement stated that the failure to return the device would result in a criminal charge of theft of property worth over $300. The Agreement did not specify any other criminal consequences of noncompliance. On June 3, 2020, the monitoring device issued a "strap tamper" alert. Defendant missed a court appearance, and a warrant was issued for his arrest. He was taken into custody in September 2020. At some point, defendant informed the authorities that the monitoring device was in his girlfriend's possession. She returned the monitoring device to the authorities. Its ankle strap had been cut. There was no evidence that defendant was ever given notice that his failure to comply with the conditions of the electronic monitoring program could result in an escape charge.

¶ 9    After the State rested, defense counsel moved for a "directed finding" on the ground that defendant had not received the required notice under section 5-8A-4(H) of the Electronic Monitoring and Home Detention Law (Electronic Monitoring Law) (730 ILCS 5/5-8A-4(H) (West 2020)) that failure to comply with the conditions of his release under the Electronic Monitoring Law could result in a prosecution for escape. The trial court denied the motion, reasoning that receipt of such notice was not an element of the offense. Defendant unsuccessfully objected to the State's proposed jury instructions that did not indicate that the State was required to prove that defendant received section 5-8A-4(H) notice.

¶ 10    The jury found defendant guilty of both escape and criminal damage to government supported property. In his posttrial motion, defendant again argued that his conviction could not stand absent proof of section 5-8A-4(H) notice. The trial court denied the motion. The court merged the criminal-damage-to-government-supported-property conviction into the escape

conviction under the one-act, one-crime rule. The court sentenced defendant to 4½ years in prison. This appeal followed.

¶ 11                                    II. ANALYSIS

¶ 12    Defendant first argues that we must reverse his conviction because he was not given the required notice under the Electronic Monitoring Law that violating the conditions of his electronic monitoring program could result in his prosecution for escape. Defendant was charged with escape pursuant to section 5-8A-4.1(a) of the Electronic Monitoring Law (*id.* § 5-8A-4.1(a)), which provides, in pertinent part:

> "§ 5-8A-4.1. Escape; failure to comply with a condition of the electronic monitoring or home detention program.
>
> (a) A person charged with or convicted of a felony *** conditionally released from the supervising authority through an electronic monitoring or home detention program, who knowingly violates a condition of the electronic monitoring or home detention program *** is guilty of a Class 3 felony."

¶ 13    During the relevant time frame, section 5-8A-4(H) of the Electronic Monitoring Law (*id.* § 5-8A-4(H)) provided, in pertinent part:

> "The supervising authority may promulgate rules that prescribe reasonable guidelines under which an electronic monitoring and home detention program shall operate. When using electronic monitoring for home detention these rules *shall* include but not be limited to the following:
>
> * * *

(H) Notice to the participant that violation of the order for home detention may subject

the participant to prosecution for the crime of escape as described in Section 5-8A-4.1."

(Emphasis added.)

¶ 14    Defendant argues that the State failed to meet its burden of proof because it presented no

evidence that he received the notice section 5-8A-4(H) requires. Defendant claims that the trial

court misinterpreted the law by ruling that receipt of section 5-8A-4(H) notice is not a prerequisite

to a prosecution under section 5-8A-4.1.

¶ 15    The pertinent facts are not in dispute. Defendant acknowledges that, by removing the

monitoring device, he violated a condition of his pretrial release. Likewise, there is no dispute that

he was not given the notice required by section 5-8A-4(H). The sole question is whether receipt of

such notice is an element of the offense of escape as defined in section 5-8A-4.1 of the Electronic

Monitoring Law or a prerequisite to prosecution. This is a matter of statutory construction. Our

supreme court recently observed:

"The cardinal rule of statutory construction is to ascertain and give effect to the legislature's

intent. [Citation.] The most reliable indicator of legislative intent is the language of the

statute, given its plain and ordinary meaning. [Citation.] It is improper for a court to depart

from the plain statutory language by reading into the statute exceptions, limitations, or

conditions that conflict with the clearly expressed legislative intent. [Citation.] Where

statutory language is clear and unambiguous, it will be given effect without resort to other

aids of construction. [Citation.] If the meaning of an enactment is unclear from the statutory

language, the court may consider the purpose behind the law and the evils the law was

designed to remedy. [Citation.] The statute should be read as a whole and construed so as

to give effect to every word, clause, and sentence; we must not read a statute so as to render

any part superfluous or meaningless. [Citation.] Words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation. [Citation.] We have an obligation to construe statutes in a manner that will avoid absurd, unreasonable, or unjust results that the legislature could not have intended. [Citation.]" *Palm v. Holocker*, 2018 IL 123152, ¶ 21.

¶ 16 Nothing in the plain language of the definition of escape in section 5-8A-4.1 of the Electronic Monitoring Law suggests that receipt of notice is an element of the offense or a prerequisite to prosecution. Defendant argues, however, that section 5-8-4.1 must be read in conjunction with section 5-8A-4(H). He contends that, because section 5-8A-4(H) provided that the rules governing an electronic monitoring and home detention program "shall" include notice that a violation might lead to a prosecution for escape, the notice requirement was mandatory for a prosecution. Defendant further argues that, if receipt of section 5-8A-4(H) notice is not an element of the offense, the notice requirement is superfluous. We consider these arguments in reverse order.

¶ 17 We disagree with defendant's argument that the notice requirement would be superfluous unless receipt of notice is an element of the offense of escape. Such a view of the notice requirement presumes that it was intended for the benefit of criminal defendants. However, by promoting compliance with the conditions of electronic monitoring, the notice requirement enhances the effectiveness of the electronic monitoring program and promotes public safety. The notice requirement serves this salutary function whether or not receipt of notice is an element of the offense of escape or a prerequisite to prosecution. On the other hand, defendant knew that he was not permitted to remove the monitoring device, and he agreed not to do so. Defendant's argument implies that the General Assembly intended to provide him (and other defendants

similarly situated) notice of the possible consequences of what he knew to be a wrongful act so that he could make an informed decision whether to violate the law. Absent a clearer expression in the language of the statute, we are unwilling to assume that the General Assembly intended such a result.

¶ 18    This conclusion leads us to reject defendant's argument that, because the notice requirement is mandatory, failure to comply requires reversal of his conviction. "Mandatory" has two different senses, depending on whether it is used in contradistinction to "permissive" or in contradistinction to "directory." See *People v. Delvillar*, 235 Ill. 2d 507, 514 (2009). When used in contradistinction to "permissive," "mandatory refers to an obligatory duty which a governmental entity is required to perform." (Internal quotation marks omitted.) *Id.* "The term permissive refers to a discretionary power, which a governmental entity may exercise or not as it chooses." (Internal quotation marks omitted.) *Id.*

¶ 19    The second distinction, which governs here, is between "mandatory" and "directory." In *Delvillar*, our supreme court explained that "statutes are mandatory if the intent of the legislature dictates a particular consequence for failure to comply with the provision. [Citation.] In the absence of such intent the statute is directory and no particular consequence flows from noncompliance." *Id.* at 514-15. The *Delvillar* court added:

"With respect to the mandatory/directory dichotomy, we presume that language issuing a procedural command to a government official indicates an intent that the statute is directory. [Citation.] This presumption is overcome under either of two conditions. A provision is mandatory under this dichotomy when there is negative language prohibiting further action in the case of noncompliance or when the right the provision is designed to protect would generally be injured under a directory reading. [Citation.]" *Id.* at 517.

¶ 20    In *Delvillar*, the defendant, a resident alien, contended that the trial court improperly accepted his guilty plea because the court did not first admonish him, as required by statute, that his conviction could affect his immigration status. In determining that the statute was directory rather than mandatory, the *Delvillar* court first noted the absence of language preventing the court from accepting a guilty plea in the absence of a proper admonition. *Id.* at 517-18. The *Delvillar* court also concluded that failure to give the statutory admonition would not *generally* impair the right the statute was designed to protect, to wit, the right to intelligently waive a jury trial and plead guilty. *Id.* at 518-19.

¶ 21    Here, as in *Delvillar*, the statutory provisions in question contain no language prohibiting a prosecution for escape in the absence of section 5-8A-4(H) notice. Also, we are not persuaded that the failure to give notice will *generally* result in violations of the conditions of release on electronic monitoring. Furthermore, as discussed above, defendant was fully aware of, and agreed to, the conditions of release on electronic monitoring. We are not persuaded that the notice requirement was designed to protect defendant from the consequences of his knowing misconduct. Defendant has only himself to blame for his escape conviction, even if it is a more severe outcome than he might have anticipated. Finally, as discussed, to the extent that section 5-8A-4(H) notice encourages compliance with the conditions of release, it benefits the public. To the extent that failure to give notice is injurious to the public, immunizing a defendant from prosecution for escape would only exacerbate the injury. We, therefore, conclude that the State met its burden of proof without showing that defendant received section 5-8A-4(H) notice.

¶ 22    We next consider defendant's argument that the trial court failed to conduct proper proceedings under *Batson*. In *Batson*, the United States Supreme Court held that the equal protection clause of the fourteenth amendment (U.S. Const., amend. XIV) forbids prosecutors from

exercising peremptory challenges to potential jurors solely on account of their race. *Batson*, 476 U.S. at 89. *Batson* developed a three-step process for determining whether a peremptory challenge violates that principle. "First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race." *People v. Davis*, 231 Ill. 2d 349, 360 (2008). "To determine at the first step whether racial bias motivated a prosecutor's decision to remove a potential juror, a court must consider the totality of the relevant facts and all relevant circumstances surrounding the peremptory strike to see if they give rise to a discriminatory purpose." (Internal quotation marks omitted.) *Id.* Relevant factors in determining the existence of a *prima facie* case include

> "(1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses." *Id.* at 362.

See also *People v. Rivera*, 221 Ill. 2d 481, 501 (2006).

¶ 23    Once a *prima facie* case has been made, the matter proceeds to the second step, at which the State must provide a race-neutral explanation for its decision to challenge the prospective juror and the defendant has the opportunity to rebut the State's explanation as pretextual. *Davis*, 231 Ill. 2d at 362-63. In the third step, "the trial court must determine whether the defendant has shown

purposeful discrimination in light of the parties' submissions." *Id.* at 363. The *Davis* court described the third step as follows:

> "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent will often be the demeanor of the attorney who made the peremptory challenge. [Citation.] Additionally, as is the case here, a race-neutral reason for a challenge often invokes a juror's demeanor (*e.g.*, nervousness, inattention, the way words are emphasized to express differing meanings), making the trial court's firsthand observations of crucial importance. In such situations, the trial court must evaluate not only whether the prosecutor's demeanor belies discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. [Citation.]" *Id.* at 363-64.

¶ 24 Where the defendant objects under *Batson* to a peremptory challenge by the State, the defendant bears the burden of making a *prima facie* case and preserving the record. *Id.* at 365. However, where, as in this case, the trial court raises a *Batson* issue *sua sponte*, that responsibility falls on the trial court. *Id.* at 366. "[T]he trial court must make an adequate record consisting of all relevant facts, factual findings, and articulated bases for both its finding of a *prima facie* case and for its ultimate determination at the third stage of the *Batson* procedure." *Rivera*, 221 Ill. 2d at 515. Moreover,

> "when the trial court acts *sua sponte* to conduct a *Batson* hearing, a bifurcated standard of review applies: the court's findings of fact, including any specific observations of record bearing on demeanor or credibility, will be accorded deference; however, the ultimate legal determination based on those findings is one that we make *de novo*." *Davis*, 231 Ill. 2d at 364.

¶ 25    In *Davis*, the trial court *sua sponte* raised the issue of whether the State improperly used a peremptory challenge against an African American prospective juror, Robert Hicks. The State replied that it exercised the challenge because Hicks equivocated when asked if he could be a fair juror. Defense counsel objected, noting that other jurors had answered similarly to Hicks but the State did not challenge them. The trial court ultimately determined that the State provided a race-neutral reason for challenging Hicks. On appeal, the defendant argued that the State's articulated reason for challenging Hicks was pretextual, as the State had accepted other prospective jurors whose answers were also equivocal. The supreme court remanded for a new *Batson* hearing. The court observed that, though the trial court *sua sponte* raised the *Batson* issue, the court "did not make any findings with respect to the credibility of the prosecutor, or with respect to the demeanor of Hicks and the accepted jurors who allegedly equivocated in their answers." *Id.* at 368. Although the defendant had not identified those jurors during the *Batson* proceedings, the *Davis* court noted that "it is also true that the trial court did not ask defense counsel to elaborate or provide any more detail as to his argument on pretext." *Id.* The *Davis* court reiterated that "the judge had the obligation to make a complete record for our review in this setting where he was essentially acting *sua sponte*." *Id.* The court concluded that what the record did show was that "the trial court collapsed the three-step *Batson* procedure into one step that looked only at whether the State could offer a race-neutral explanation for the strike." *Id.*

¶ 26    Defendant argues that the trial court here failed to follow the three-step process outlined in *Batson* and failed to adequately develop the record for review. Defendant acknowledges that, because he did not raise the issue in his posttrial motion, he failed to preserve it for appellate review. See, *e.g.*, *People v. Enoch*, 122 Ill. 2d 176, 187 (1988) (failure to include an issue in a

posttrial motion results in forfeiture of that issue on appeal). However, defendant argues that the issue is reviewable under the plain error rule. The plain error rule has been explained as follows:

> "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Quoting *People v. Lann*, 261 Ill. App. 3d 456, 467 (1994), defendant contends that, "[i]n [defendant's] case, the second prong applies because 'discrimination in selecting a jury disgracefully impugns the integrity of the judicial process.' " The State responds that the first step in the plain error analysis is to determine whether error occurred at all. See *People v. Walker*, 232 Ill. 2d 113, 124 (2009). According to the State, no error occurred and thus there was no plain error. For the reasons set forth below, we disagree with the State.

¶ 27    Here, as in *Davis*, the trial court raised the *Batson* issue *sua sponte*. Accordingly, the court was required to make an adequate record of the bases of its finding of a *prima facie* case. Here, the trial court not only failed to make an adequate record, but it also never even expressly found that a *prima facie* case existed. Although the State infers that the trial court found a *prima facie* case, that inference is insufficient to satisfy the requirements of *Davis*, which requires the trial court to make an adequate record of its finding of a *prima facie* case.

¶ 28    Regarding the second step of the *Batson* process, the State contends that it offered a race-neutral reason for challenging Wilbert. When the trial court asked the State to provide such a

reason, the State said it was concerned that, in his work as a bank examiner, Wilbert used common sense and discretion in determining when to enforce banking laws. The State wanted jurors who would apply the law exactly as instructed. This reason was clearly race-neutral. As the *Davis* court explained, "a 'neutral explanation' means any 'explanation based on something other than the race of the juror.' " *Davis*, 231 Ill. 2d at 367 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)). But for a peremptory challenge to survive a *Batson* objection, the trial court must find, at the third step of the *Batson* process, that the State is not guilty of purposeful discrimination, which depends on whether the proffered reason for the peremptory challenge was pretextual. Moreover, as previously explained, *Davis* requires the trial court to make a record of its findings when (as here) it acts *sua sponte*. The court here simply declared that it believed "that the [S]tate has a reason that would comply with *Batson.*" It is not altogether clear whether this was a finding of no purposeful discrimination or simply a finding that the State offered a facially race-neutral reason for the peremptory challenge. Even assuming, for the sake of argument, that the trial court made the appropriate finding, the record is inadequate because, as in *Davis*, the trial court did not make a record sufficient to facilitate a meaningful review of that finding. Notably, as in *Davis*, the trial court did not make any findings as to the credibility of the prosecutor or the demeanor of the challenged juror, which are principal considerations in determining whether the prosecutor engaged in purposeful discrimination.

¶ 29    We conclude that a remand for a proper *Batson* hearing is necessary. We retain jurisdiction to review the trial court's decision on remand, which it shall support with appropriate findings of fact and conclusions of law. The trial court shall hold a hearing within 30 days of the filing of this opinion. Following the hearing, the trial court shall, within 60 days, file its findings and conclusions with the clerk of this court, accompanied by the record of the proceedings on remand.

Then, the parties shall have the opportunity to submit supplemental briefs to this court if they so choose.

¶ 30                                    III. CONCLUSION

¶ 31    For the reasons stated, we remand this cause to the circuit court of McHenry County for further proceedings consistent with this opinion.

¶ 32    Cause remanded.

---

*People v. Duffie*, 2022 IL App (2d) 210281

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 20-CF-714; the Hon. Robert A. Wilbrandt Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Ann Fick, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Ivan O. Taylor Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---